JOHN WRIGHT

*v.*

WILLIS LANTZ

(No. 10109)

Submitted February 1, 1950. Decided March 7, 1950.

*William T. George, Jr., I. Raymond Murphy,* for plaintiff in error.

*William T. George, Sr., Dayton R. Stemple,* for defendant in error.

Fox, JUDGE:

This is an action of trespass on the case, instituted in the Circuit Court of Barbour County, to recover damages for alleged malicious prosecution of a criminal charge, in which action John Wright is plaintiff and Willis Lantz is defendant. The declaration alleged a good cause of action, and the same was not attacked by demurrer or otherwise. There was a plea of not guilty, and a trial by jury, resulting in a verdict for the plaintiff and against the defendant in the sum of $1,000.00, on which verdict, after a motion to set aside the same had been overruled, judgment was

entered on the 10th day of June, 1948. On October 18, 1948, at the instance of the defendant below, we granted this writ of error.

There are sixteen assignments of error, some of which relate to instructions given to the jury by the court during the trial. These we cannot consider because the instructions given are not a part of the record before us. Evidence taken in the case was made a part of the record by a bill of exceptions, and aside from pleadings which are not questioned, raises the only matter we may consider on this writ of error. The several assignments of error, involving the evidence, may be reduced to the simple question of whether or not the same was sufficient to sustain the verdict returned by the jury.

The circumstances of the case, as disclosed by the evidence, is that defendant below, Willis Lantz, was the owner of farm lands near Philippi, in Barbour County, on which was located what is known as a tenant house. In the month of December, 1946, he verbally leased the tenant house and premises to the plaintiff, John Wright. The terms of that lease were that Wright was to work for Lantz when asked to do so, and pay $15.00 per month for the leased premises if he performed no work. The record is not clear whether this payment of rent was to be made in the event Wright worked for his landlord, but Wright was to receive $2.00 a day for the time he worked. Whether the rent was to be taken out of the wages due for any work he might perform is not clear. In addition to this feature of the lease contract, Lantz was to furnish equipment and horse power for breaking about 4.2 acres of sod land, in which corn was to be planted the following crop season, but Wright was to do all the work in connection with breaking the sod and the planting and cultivating of the corn crop. When the crop matured the corn was to be equally divided, and if Wright then owned a cow he was to have one-third of the fodder. Wright was moved into the tenant house by Lantz for which a charge of $12.00 was made. During the winter of 1946-47, Lantz furnished Wright a supply

of coal for which $16.00 was charged, and approximately 31 hundred pounds of hay for which a charge of $1.50 per hundred was made.

Shortly before the beginning of the crop season of 1947, according to the testimony of Lantz, Wright informed him that he could not carry out his agreement to cultivate the 4.2 acres because it was too much for him, saying that he was unable to work, and that he was applying for an old age pension. Thereafter, Lantz plowed the field with a tractor, harrowed the same, spread a substantial amount of fertilizer, and planted the seed corn. Following this, and, according to Lantz, at his insistence, Wright did cultivate the corn field and worked approximately seven days in so doing. The record does not disclose what, if any, new arrangement was made as to the division of the crop, but Lantz contends that the crop was his own and that he was to pay Wright for the work he did in connection therewith. Wright's contention is that he was entitled to one-half of the corn in accordance with the original agreement.

In the latter part of September, 1947, after the corn crop had matured, it is the contention of Wright that he sold his half interest in the corn to two of his sons. At any rate, the two sons, without consultation with Lantz, or any notice to him, entered upon the 4.2 acres, husked the corn and removed from the field and into a barn on the premises leased to Wright, what they say was one-half thereof, presumably under the claim that that one-half had belonged to John Wright from whom they claim to have purchased the same. The day the corn was removed, Willis Lantz was away from his home, but on his return late in the afternoon, on learning that the corn had been taken, visited the Wright home, which was a short distance from his own home, and made some inquiry about the matter. He did not find Wright at his home or any other person except Wright's wife, and according to his, Lantz, testimony, this occurred: "I asked her what they had taken the corn for, and I asked her who hauled the corn, and she said the boy had got it." That appears to have ended Lantz' action on that afternoon.

On the next morning, Lantz went to Philippi to consult the prosecuting attorney as to the course of action to be taken. The prosecuting attorney was ill and could not be interviewed. Lantz then went to the office of I. Raymond Murphy, whose standing as a reputable attorney is not questioned, and assumed to lay the facts regarding the corn crop dispute before him. Inasmuch as the question of whether full disclosure was made by Lantz to Murphy is important, it seems advisable to quote Murphy's testimony as to what disclosure was made to him by Lantz. It is clearly shown that such disclosure was the basis for the advice given to Lantz by Murphy on that occasion. According to the testimony of Murphy, this is what happened:

"Well, he told me that he entered into a contract with Mr. Wright to move on his place; in fact; I knew all about it because they had consulted with me about my farm, and then they moved on the Lantz farm, and Mr. Lantz had come to me in July, 1947, and conferred with me about Mr. Wright breaking his contract and would not work and I prepared a notice for him asking Mr. Wright to move as of the 1st day of August, 1947, and then Mr. Lantz came to me on this Friday morning and explained to me that he had put out a corn field himself, that Mr. Wright had refused to put it out, and that he had not plowed the ground or worked it down and had not spread the fertilizer or drilled the corn, and that he had insisted upon Mr. Wright doing some work, and that Mr. Wright did work the corn by the day and had worked through it three times, and that on this particular day that he had been away, I believe he said to · Elkins, and that when he came home in the evening his son told him the Wrights had gone out and had stripped the corn, or the biggest part of it, or something to that effect, and that he first went to the Wright home and asked for Mr. Wright and that he was not at home and they refused to give him any information about the corn and he told me that his son had been up there and had seen the corn in Mr. Wright's grainery and being unloaded. He asked my advice what to do and, from the criminal aspect of it, I advised

him to go to Mr. Wm. T. George, Jr., the prosecuting attorney, and he was then informed that Mr. George was in bed sick at home and couldn't see him, and upon the statement of facts & upon the information that he gave me I advised him to go before the Justice of the Peace and swear out a larceny warrant against Mr. Wright for stealing his corn."

Following this conversation between Lantz and Murphy, Lantz went to the office of A. E. Shaw, a justice of the peace. There he made complaint and requested the issuance of a warrant for the arrest of Wright on a charge of grand larceny. Shaw raised some question as to whether a warrant was proper, suggesting, in substance, that a civil suit might be more advisable, whereupon Lantz and the justice went to the office of I. Raymond Murphy where further consultation was had, the result of which was the issuance of a warrant upon the complaint of Willis Lantz charging John Wright with the larceny of 175 bushels of corn, of the value of $200.00. The complaint and warrant appears in the record as Exhibit No. 1, and appears to be dated September 22, 1947. Waiving the question of how the warrant may be made an exhibit with a declaration in a law action, there is sharp dispute in the evidence as to the date on which the warrant was actually issued, and the date of action thereon before the justice. There is much evidence indicating that the warrant was issued on September 26, 1947, a motion made in the case on September 29, and the final disposition of the warrant on October 1, and this, in spite of the fact that the warrant appears to be dated September 22. There is also dispute as to how the warrant was disposed of. Wright employed counsel who appeared before the justice and moved to quash the same, which motion appears to have been overruled. At a time not later than October 1, 1947, the warrant was dismissed, either upon motion of Wright's counsel, or upon motion of counsel for Lantz. We do not attempt to decide just how the warrant came to be dismissed, and we do not think it material, because the fact is that the prosecution against Wright was then aban-

doned, and no further efforts were made to prosecute Wright for the alleged larceny of the corn.

This action was instituted on the 3rd day of January, 1948, and the declaration was filed at January Rules, 1948. As indicated above, the contention of Willis Lantz, the defendant below, is that the corn crop produced on his 4.2 acres of land was his property; that the taking thereof by John Wright amounted to the larceny thereof; and that the facts hereinbefore set out furnished probable cause for the action he took in making complaint and having issued a warrant for the apprehension of the said Wright for the alleged larceny.

On the other hand, the contention of Wright is that one-half of the corn produced on said plot of land belonged to him, under his agreement with Lantz; that he sold his one-half interest to his two sons; that he did not remove the corn but that it was removed by the sons under their purchase; that he was not guilty of larceny of the corn; and that the prosecution instigated by Lantz against him growing out of the removal of the corn was not based upon probable cause, or upon grounds which should lead to the belief that the larceny alleged against him had been committed. As stated above, this presents the single question of whether, under established law with relation to actions for malicious prosecution, a case in favor of the plaintiff was established by the evidence.

Fortunately, the law in respect to what is necessary to constitute malicious prosecution is well settled in this State. In the case of *Hunter* v. *Beckley Newspapers Corporation*, 129 W. Va. 302, 40 S. E. (2d) 332, the law is stated as follows:

> "To sustain an action of trespass on the case for malicious prosecution of either a civil suit, action or proceeding, or a criminal charge, there must be a showing, from a preponderance of the evidence, of both malice and want of probable cause in the prosecution complained of. Absence of a showing of either is fatal to the plaintiff's claim for recovery."

"Malice may be inferred from the prosecution of a civil suit, action or proceeding, or a criminal charge, where want of probable cause for such prosecution is shown by a preponderance of the evidence."

"Want of probable cause is not established by, and may not be inferred from, a showing of malice in the prosecution of a civil suit, action or proceeding, or a criminal charge."

"A suit, action or proceeding, prosecuted in good faith, and on advice of reputable counsel obtained after a fair and accurate disclosure to counsel of the facts on which advice is sought, may not serve as the basis of an action for malicious prosecution."

The application of the law to the facts presented here is not difficult. We are of the opinion that in all the circumstances of the case the defendant, Lantz, was justified in his claim that he was the owner of all of the corn produced on the 4.2 acres of land owned by him; that Wright had failed to comply with his agreement to do all of the work in connection with the planting and cultivating of said corn crop; and that, as a matter of fact, Wright abandoned his undertaking to plant and cultivate the corn crop on said plot of land, and was not entitled to any more than pay for the labor he performed in cultivating the crop after Lantz had plowed the ground and planted the crop. This being true, the crop belonged to Lantz and when husked became the subject of larceny. Inasmuch as Lantz had no notice of any sale of Wright's claimed interest in the corn, he had the right to assume that the same was removed by Wright, either personally or by his agents and employees. In the circumstances of this case, the fact that the corn may have actually been removed by the sons of Wright under a claimed purchase did not alter the situation which confronted Lantz at the time he first learned that the corn had been removed. It was natural to assume that Wright was responsible for the removal of the corn, and Lantz had the right to act on that assumption. The fact that the wife of Wright told

him that the boys got the corn is of no significance. We think, therefore, that the circumstances shown by the evidence was sufficient to justify the belief on the part of Lantz that a larceny of his corn had been committed, and furnished the basis for his action in making the complaint and instigating the prosecution for such supposed larceny. In other words, there was, at the time Lantz made his complaint, probable cause to believe that there had been a larceny of the corn by John Wright. Therefore, probable cause being shown for the issuance of the warrant, there was not that lack of probable cause necessary to establish a case of malicious prosecution.

There being no want of probable cause, there could be no inference of malice. But even if malice was otherwise shown, which has not been shown in this case, the action could not be maintained in the absence of a showing of want of probable cause. Want of probable cause and malice must both exist to justify an action for malicious prosecution. Where want of probable cause is shown malice may be inferred therefrom; but even if malice is shown, want of probable cause may not be inferred therefrom, but must be established as an independent proposition.

A further bar to any recovery in this action is the fact that, in our opinion, the defendant, Lantz, made a full and complete disclosure of the facts and circumstances on which the warrant aforesaid was issued to a reputable attorney and, in making the complaint on which the said warrant was issued, followed his advice. It has always been the law, so far as we know, that a person in instigating a civil suit or a criminal prosecution is protected against actions for malicious prosecution in cases where he has submitted, in good faith, the matters upon which he acts to a reputable attorney, and made a full disclosure to such attorney of all matters in connection with the proposed prosecution. We think the evidence clearly discloses that Lantz did make a full disclosure of his dealings with Wright in respect to the corn crop and his dealings

with Wright following the lease ageement made in December, 1946. The only basis for any other contention is that, according to the statement of Murphy, Lantz is reputed to have said that he went to Wright's home on the evening the corn was taken, and that not finding Wright at his home, Mrs. Wright told him on that occasion that the boys had got the corn. As indicated above, we do not think this was important as a concealment of any of the facts upon which Murphy gave his advice to Lantz.

Therefore, upon the two grounds that there was no want of probable cause for the issuance of the warrant issued upon complaint of defendant, Lantz, and the further fact that full disclosure of the whole matter was made by Lantz, in good faith, to a reputable attorney, and that he acted upon the advice given by such attorney, we conclude that there was no legal basis for the jury verdict in favor of the plaintiff, and that such verdict should have been set aside.

We, therefore, reverse the judgment of the Circuit Court of Barbour County, entered on June 10, 1948, set aside the verdict upon which said judgment was based, grant the defendant a new trial, and remand the case to said court for that purpose.

*Reversed and remanded with directions.*