ARCHIE A. TRUMAN

*v.*

FIDELITY & CASUALTY COMPANY OF NEW YORK

(No. 12100)

Submitted October 3, 1961. Decided November 14, 1961.

708

*Steptoe & Johnson, Stanley C. Morris, Carl F. Stucky, Jr.,* for plaintiff in error.

*Laird, Thrift & Hamilton, R. J. Thrift, Jr.,* for defendant in error.

CALHOUN, JUDGE:

This case involves an action for malicious prosecution instituted in the Circuit Court of Fayette County, in which the plaintiff sought recovery of damages in the sum of $50,000. The action is predicated on an alleged malicious prosecution of the plaintiff by the defendant on a criminal charge of obtaining money under false pretenses. The money involved in the criminal prosecution was the sum of $2,335, paid by the defendant, as an insurer, to the plaintiff, as the insured, for damages resulting from the destruction

of his automobile. The jury returned a verdict in favor of the plaintiff in the malicious prosecution action in the sum of $9,000; and, in response to a special interrogatory, answered that $7,500 of the total sum represented compensatory damages and $1,500 represented punitive damages. From a final order entered July 6, 1960, by which the trial court overruled the defendant's motion to set aside the verdict and award it a new trial and entered judgment for the plaintiff on the verdict of the jury, the defendant prosecutes this writ of error.

While numerous assignments of error are made by the defendant in its petition for a writ of error and in the brief filed in its behalf, such assignments, in the main, challenge the sufficiency of the proof of malice and lack of probable cause. Under such circumstances, we are called upon to incorporate herein a rather full statement of the facts disclosed by the record.

Archie A. Truman, the plaintiff, at the time of the commencement of the events resulting in this case, lived at Bentree, West Virginia, with his wife and ten children. He was employed at that time at a coal mine in Kanawha County near Montgomery, and worked on a shift which commenced at 11:30 p. m. and terminated at 7:30 a.m. He was the owner of a 1957 model Pontiac automobile, the purchase of which was financed through Merchants National Bank of Montgomery. On or about March 18, 1958, when approximately $2,300 remained owing and unpaid by the plaintiff to the bank, he parked his automobile outside the mine when he went to work therein. Next morning the automobile was missing. Later it was found abandoned below a highway on Gauley Mountain in a severely damaged condition. The defendant authorized and paid for necessary repairs. The plaintiff testified that when he drove his automobile away from the garage at which it had been repaired, the steering mechanism did not operate properly; that the automobile "would wander on the road"; and that such condition continued with-

out improvement. His testimony in this respect was corroborated by the testimony of various other witnesses.

In the late afternoon of May 2, 1958, approximately six weeks after the plaintiff's automobile disappeared from the parking lot outside the mine at which he worked, he left his home in his automobile, and, according to his testimony, proceeded to Gauley Bridge and thence by way of U.S. Route No. 60 to Montgomery to get some tomato plants for his mother. Upon arrival at Montgomery, he discovered that the hardware store at which he intended to purchase the tomato plants was closed. Thereupon about 6:30 or 7:00 p.m., he left Montgomery to return to his home. In returning, he chose a different course of travel over a road, described as Secondary Route 2, which, according to the testimony, is a narrow, steep, rough road, apparently having a single lane of paving. The plaintiff testified further that, while proceeding by this route over Marting Mountain, he "hit a chug hole and lost control of the steering, couldn't steer it"; that the automobile "commenced to weave to the right and went back to the left and hit the berm, what berm there was there, and I couldn't get it back on it"; and that when it was apparent that the automobile was leaving the road and going over the steep descent below the road, he jumped out of the automobile. He testified that after the automobile came to rest a considerable distance below the road, the horn sounded and the lights blinked intermittently; that the automobile ignited and burned; and that thereupon he walked about four or five miles in the rain to his home. Next morning he got in touch with a representative of defendant company at Montgomery, and also arranged for wrecker service to retrieve his automobile. He testified that he undertook to notify police authorities, but that next morning he learned that L. K. Toney, a deputy sheriff residing at Gauley Bridge, had already visited the scene and checked the situation. Substantially the same account of the entire

occurrence had been embodied previously in a written statement in the nature of proof of loss made by the plaintiff on May 14, 1958.

On May 23, 1958, the defendant made and delivered its draft for $2,335, payable to the order of Archie A. Truman and Merchants National Bank, the beneficiary of a loss payable clause in the insurance policy, in satisfaction of the loss sustained by the plaintiff. It was on a charge of obtaining this sum of $2,335 by false pretenses that the plaintiff was indicted by a grand jury of the Circuit Court of Fayette County at the September, 1959, term thereof, and it was that criminal prosecution which formed the basis of the action for malicious prosecution involved herein.

Robert O'Neal, an insurance adjuster who dealt with plaintiff in behalf of the defendant company in connection with the damage caused to the automobile on April 15, and also in connection with its destruction on May 2, testified as a witness for the defendant. Between May 2 and May 14, 1958, he went to the scene of the destruction of the automobile on Marting Mountain and in relation thereto, he testified: "* * * at the spot where the automobile had gone over the hill, that was the only clear section that there was in the mountain area where the automobile could have gone over the hill, or over the mountain", because "there were no trees to impede the car from going over the hill at that point." Other witnesses for the defendant testified to the same effect. O'Neal testified further that theft and fire losses of motor vehicles are normally referred to the National Automobile Theft Bureau for investigation, and that the loss of May 2 was accordingly referred to that agency. In consequence thereof, the matter was in turn referred for investigation to Gerald Dibert, who was then a special agent for National Automobile Theft Bureau, residing at St. Albans, West Virginia, a part of whose duties was to assist police officers in automobile theft and arson investigations. On August 7, 1958, Dibert proceeded to the state police detachment headquarters at Can-

nelton, near Montgomery, where he conferred with Trooper C. Legursky. This conference commenced about 9:00 a. m., without previous arrangement. Dibert and Legursky then proceeded to the point in question on Marting Mountain, and from there they went to the home of the plaintiff, at which place they arrived about ten or eleven o'clock in the forenoon. After talking with Legursky and Dibert in the police automobile, which was parked near his home, Truman went with the two investigating officers to the scene of the destruction of the automobile. Truman meantime had expressed a willingness to submit to a polygraph or lie detector test and, pursuant to arrangements made by police radio, he was taken later that day by Legursky and Dibert to the Criminal Identification Bureau of the Department of Public Safety in the State Capitol in Charleston, where the polygraph test was given by Sergeant J. D. Baisden. From the time Truman was first questioned in the forenoon in the police automobile in front of his home until the arrival at the State Capitol, he was questioned intermittently by Legursky and Dibert, and meantime he consistently denied having intentionally destroyed his automobile. Legursky and Dibert were not present while the test was being given by Sergeant Baisden.

Following the completion of the polygraph test, but while still at the State Capitol, the plaintiff, according to the testimony of Trooper Legursky, made a statement pertaining to the episode under investigation. In that connection the following questions were propounded to Legursky and he gave the following answers:

"Q. Tell us, please, in substance, what that was?

"A. He told me orally while we were at the C. I. B. that he had went to Montgomery to buy some tomato plants, and that he drove down the street and all the stores seemed to be closed so he drove back up across Marting Mountain and after he got on the other side of Marting Mountain the car wasn't handling right, it hadn't been handling right since they worked on it, and he

"just decided to run it over the hill and let the insurance company pay for it.

"Q. Was any one else present at the time Mr. Truman made this statement to you?

"A. He made the statement twice; once to me alone and once to all three of us.

"Q. By all three, who do you mean?

"A. Sergeant Baisden, Gerry Dibert and myself.

"Q. After that statement was made to you at Charleston did you and Mr. Truman and Mr. Dibert go anywhere else?

"A. Yes, sir, we came back to the Cannelton office.

"Q. What did you do there?

"A. We took a written statement from him, Mr. Truman.

"Q. At the time of taking that written statement where did you get the information that you put in it?

"A. Mr. Truman told me.

\* \* \*

"Q. Can you tell us whether or not Mr. Truman read the statement before he signed it?

"A. He had it in his possession and looked at it long enough to read it.

"Q. But whether he actually read it, of course, you do not know?

"A. No. sir."

Dibert testified as follows concerning a statement made orally by Truman in his presence and in the presence of Legursky and Baisden at the State Capitol following the polygraph test: "He said that as he was traveling down the mountain and the car developed sort of a shimmy, and he decided just to let the insurance company pay for it, and he headed it in the direction of the bank and got out and left it go over the bank." In reference to the written statement signed by Truman later that day at the state police head-

quarters at Cannelton, Dibert was asked the following questions and gave the following answers:

"Q. Where did Mr. Legursky get the information contained in that statement, if you know, in order to write it?

"A. From Mr. Truman.

"Q. At what time was the information given to Mr. Legursky? By that I mean, when you were back at Cannelton when he was typing it, before, or after, or when?

"A. It was given at Cannelton. As it was given, he typed it.

"Q. After the statement was typed up, what was done with it?

"A. It was given to Mr. Truman, who took the statement, sat down there and read it and after he read it he signed it.

"Q. Did you and Mr. Legursky then sign as witnesses?

"A. Yes, sir, we did.

Sergeant J. D. Baisden was asked the following question and made the following answer:

"Q. Will you state what that statement was, please?

"A. He stated that he was returning from Montgomery and was going up apparently an isolated road and the car began to shimmy and he stepped out of it and let it go over the hill, and the lights blinked once or twice, the horn blew a little bit and the car caught fire."

The plaintiff, as a witness, denied having made the oral statements at Charleston which were attributed to him by Dibert, Legursky and Baisden. He denied having stated to anybody at any time or place that he purposely permitted his automobile to leave the highway on the occasion in question. He testified that Dibert and Legursky, particularly Legursky, asked him some questions during the time the written statement was being typed by Legursky, but he insisted that his answers or statements then and there were "the same

thing as is outlined in general'' in the original statement made to the insurance adjuster on May 14, 1958. In his testimony the plaintiff admitted that he signed the written statement, but he testified that before doing so he read only ''about three paragraphs of it.'' The written statement in its entirety is as follows:

"STATEMENT OF ARCHIE TRUMAN

"Montgomery Detachment Office

August 7, 1958

"My name is Archie Truman, I am 33 years of age and reside in Bentree, Nicholas County, West Virginia. I have been told that I need not make this statement unless I desire to do so and that everything I say must be of my own free will, and that anything I say can be and will be used either for or against me in a criminal prosecution, nevertheless I do state the following:

"Some time in the middle of April my car was stolen at the Lady Dunn Mine parking lot in Kanawha County. The State Police found it the next day, and it had been wrecked on top of Gauley Mountain in Fayette County, West Virginia.

"Montgomery Motors in Montgomery, West Virginia was going to fix the car but someway it was contracted out to B & M Motors on st. rt. 61.

"When my car was returned to me it wasn't completely repaired. I didn't notice this until I drove it across some rough road. I took the car back to Montgomery Motors and they called my insurance agent. The agent told them to go ahead and put whatever it needed into it. The Montgomery Motors garage then got in touch with B & M Motors and they told me to bring the car in the end of the week. I used the car the rest of the week and didn't take it back to the garage.

"On Friday, May 2, 1958, about 6:30 P. M. I was over in Montgomery trying to buy some tomato plants. None of the stores seemed to be open and I decided to go back home. When I started up Sec. Rt. 2 to Marting Mountain I wasn't thinking *to* much about the car being no good but when I got to the top and started to hit the holes in the road and it started to acting up I decided to get out of the car and let the

insurance company pay for it. I owed between 2400 and $2,500.00 on the car. When I got to a place where it looked open I started the vehicle toward the edge of the bank and jumped out of it. I was traveling about 15 or 20 miles per hour. Some part of the vehicle hit me and twisted me around a little. When I twisted a little it seemed to hurt my hip.

"The car went over the hill and rolled one time and seemed to stop for just a second. Then it started to roll again this time it didn't stop until it hit the bottom. The horn blew a few times and the head lights blinked some and then the car caught on fire. I watched it a few minutes and then started to go home. The car was burning good when I left. I walked home and went to bed and got up the next morning and reported the wreck to my insurance company.

"I have read the above statement and certify that it is true and correct.

"Signed: ARCHIE ALLEN TRUMAN

"Witnessed: GERALD R. DIBERT

"Witnessed: C. LEGURSKY"

Thereafter Dibert made a complete written report of his investigation and transmitted it to the New York office of his employer, the National Automobile Theft Bureau. Copied therein as a part thereof were the two written statements signed by the plaintiff. This information, including photostatic copies of the two written statements signed by the plaintiff, was transmitted to the offices of Fidelity & Casualty Company of New York, the defendant, at its home offices in New York City, and in April 1959, the matter, ''including the company's entire file'' came to the attention of Frank D. Barrett, an attorney, employed in the home offices of the defendant as superintendent or ''supervising attorney in charge of the home office casualty claims department,'' who testified at the trial as a witness for the defendant. In the meantime, on December 29, 1958, W. S. Carpenter, Senior Examiner, Auto Physical Claims Division of the home office of the defendant

company, directed a letter to the defendant's offices in Charleston, West Virginia, containing the following:

> "It is the consensus that you should contact the assured and endeavor to secure a promissory note on the ground that: since payment was made we have learned that perhaps his claim was not one that should have been paid. Care must be exercised, however, that we do not *compond* a felony. No promise whatsoever can be made to the assured.
>
> "Will you please make contact with the assured and let us know the results of your efforts to collect the monies that we have paid for this loss in question. We also suggest that you request a Retail Credit Report to check on the assured's financial situation."

On March 18, 1959, Thomas E. Bumgardner, who at that time was employed as an adjuster for the defendant, went to the home of the plaintiff in an effort to procure his signature on a note for $2,335, in accordance with the request from defendant's New York offices. The plaintiff was then absent from his home, and, under such circumstances, Bumgardner discussed the matter with the plaintiff's wife, and left with her for delivery to the plaintiff an unsigned promissory note for $2,335, and a letter written in longhand and signed by Bumgardner, as follows:

> "3/18/59
>
> "The company has requested that I obtain a promissory note from you for the amount of the damages paid by us for the loss of your *Ponaitc* on 5/2/58.
>
> "The company is willing to accept any reasonable monthly payments that you are able to pay.
>
> "Here is the promissory note completed for $2335.00 which represents that amount we have paid.
>
> "I have contacted Trooper Legursky at Smithers and he advised that they had obtained a confession from you regarding the loss.
>
> "Please complete the note and return to us in the envelope provided. * * *"

Bumgardner testified that he did not make any further effort to have the note signed because he received instructions from the home office to make no further effort "to collect from Mr. Truman", but rather to obtain "the original confession" from Trooper Legursky and "present the confession and other necessary information to the prosecuting attorney so that he could use those pieces of evidence for their case against Mr. Truman." Accordingly, Bumgardner and his superior, Mr. Robert W. Lowe, Claims Manager for defendant's Charleston office, went to Fayetteville, discussed the matter with Zane Summerfield, prosecuting attorney of Fayette County, and left with him the documentary evidence in their possession.

Frank D. Barrett, supervising attorney in the defendant's home office in New York City, testifying as a defense witness, stated that he was graduated from Georgetown University Law School, and was admitted to the bar in the District of Columbia in 1931; that in 1955, while on duty with the defendant company in California, he was admitted to the practice of his profession in the courts of that state; that in April, 1959, the Truman claim was brought to his attention as supervising attorney; that in that connection he had "access to the company's entire file"; that the vice president of the defendant sought his advice; that after having reviewed the information before him, he discussed the matter with the vice president; that he instructed the Charleston, West Virginia, office to desist from making any effort to "contact Mr. Truman" or to seek repayment from him; and that by letter, dated April 16, 1959, he instructed R. W. Lowe of the Charleston office to obtain "the original signed confession" from Legursky, and by such letter he recommended "criminal action". While such letter apparently was not formally admitted in evidence, Attorney Barrett testified that he left it entirely to the prosecuting attorney to determine whether a criminal prosecution should be instituted. In July, 1959, Lowe and Bumgardner went to Fayetteville where the matter

was discussed with Zane Summerfield, prosecuting attorney of Fayette County, and evidence in their hands was left with Summerfield. On the first day of the grand jury session at the September, 1959, term of the Circuit Court of Fayette County, Bumgardner and Legursky were present at the courthouse. Bumgardner testified that he did not go there on that occasion for the purpose of testifying before the grand jury and did not do so. Testimony on which the indictment was based was given by Legursky. The plaintiff testified that, upon receiving information of the fact of the indictment, he went to Fayetteville, engaged the services of an attorney, appeared before the circuit court, entered a plea of not guilty, and gave bond for his subsequent appearance. The case was set for trial on the indictment at the January, 1960, term of court.

On January 18, 1960, on motion of the prosecuting attorney, the court entered an order of *nolle prosequi*, and the indictment was dismissed. The record fails to disclose the reason for the termination of the criminal prosecution in that manner. Zane Summerfield, a witness for the defendant, testified that he did not seek the consent or approval of the defendant or its agents before dismissing the indictment; that ''the consent was not theirs to give''; and that the decision to dismiss was his alone. Summerfield did testify, however, that he had discussed the matter with Trooper Legursky, and that Legursky ''said it really didn't make much difference with him one way or the other; that he would just like to have it disposed of so that his records could be cleared up in the detachment office.'' On cross-examination of Attorney Barrett, he was asked the following question and gave the following answer: ''Are you familiar with a principle of law existing in the State of West Virginia to the effect that the *corpus delicti* of a criminal offense in a criminal prosecution cannot rest upon a confession alone? Are you familiar with that proposition?; A. No, sir.'' Since the prosecuting attorney while a witness, was

not requested by counsel for either side to state his reason or reasons for dismissal of the indictment, it would be purely speculative to assume that his reason for doing so was based on his conviction of the soundness of the legal proposition asserted in the question propounded by the plaintiff's counsel to Attorney Barrett. We are not called upon to decide, and do not decide, whether such legal proposition is a sound, tenable one as applied to the factual situation in this case. It is a fact, nevertheless, that the record is devoid of anything disclosing that the dismissal was procured by or even consented to by the defendant or any of its agents, or that such dismissal was with the prior or contemporaneous knowledge of the defendant or any of its agents.

At the trial, the testimoney of witnesses for the plaintiff indicated that a piece of metal described as a broken portion of a tie rod, a part of the steering mechanism of the plaintiff's automobile, was found lying on the ground "over the hill" near the point where the automobile left the highway on Marting Mountain. We note that the written statement made subsequently by the plaintiff to the insurance adjuster contained no reference to such facts. Such facts, in any event, are of little significance in the light of the plaintiff's subsequent statement in writing which, if genuine, constituted a confession of guilt of an intentional destruction of the automobile. Probable cause, or the absence thereof, is not dependent on the ultimate guilt or innocence of the person prosecuted.

A corporation may be held liable to respond in damages in an action for malicious prosecution. *Hunter v. Beckley Newspapers Corporation,* 129 W. Va. 302, 309, 40 S. E. 2d 332, 336; *Wolford v. Goldey Brothers, Inc.,* 114 W. Va. 259, 171 S. E. 537. " 'To sustain an action of trespass on the case for malicious prosecution of either a civil suit, action or proceeding, or a criminal charge, there must be a showing, from a preponderance of the evidence, of both malice and want of probable cause in the prosecution complained of. Absence

of a showing of either is fatal to the plaintiff's claim for recovery. Malice may be inferred from the prosecution of a civil suit, action or proceeding, or a criminal charge, where want of probable cause for such prosecution is shown by a preponderance of the evidence. Want of probable cause is not established by, and may not be inferred from, a showing of malice in the prosecution of a civil suit, action or proceeding, or a criminal charge.' *Hunter v. Beckley Newspapers Corporation*, pts. 2, 3 and 4, Syl., 129 W. Va. 302.'' *Wright v. Lantz*, 133 W. Va. 786, Pt. 1, Syl., 58 S. E. 2d 123. ''The public policy favors prosecution for crimes and requires the protection of a person who in good faith and upon reasonable grounds institutes proceedings upon a criminal charge. The legal presumption is that every prosecution for crime is founded upon probable cause and is instituted for the purpose of justice.'' *McNair v. Erwin*, 84 W. Va. 250, pt. 4 syl., 99 S. E. 454; *Staley v. Rife*, 109 W. Va. 701, pt. 1 syl., 156 S. E. 113; *Hunter v. Beckley Newspapers Corp.*, 129 W. Va. 302, 310, 40 S. E. 2d 332, 337. ''In an action for malicious prosecution, plaintiff must show: (1) that the prosecution was set on foot and conducted to its termination, resulting in plaintiff's discharge; (2) that it was caused or procured by defendant; (3) that it was without probable cause; and (4) that it was malicious. If plaintiff fails to prove any of these, he can not recover.'' *Radochio v. Katzen*, 92 W. Va. 340, pt. 1 syl., 114 S. E. 746. ''By 'legal malice,' as applied in actions for malicious prosecution, is meant any sinister or improper motive other than a desire to punish the party alleged to have committed the offense. Where the chief purpose in instituting the criminal proceeding is by such means to compel the return of property claimed by the prosecutor, it is malicious.'' *McNair v. Erwin*, 84 W. Va. 250, pt. 2 syl., 99 S. E. 454. ''Probable cause for instituting a prosecution is such a state of facts and circumstances known to the prosecutor personally or by information from others as would in the judgment of the court lead a man of ordinary caution, acting

conscientiously, in the light of such facts and circumstances, to believe that the person charged is guilty.'' *Radochio v. Katzen,* 92 W. Va. 340, pt. 2 syl., 114 S. E. 746.

While malice may be inferred from lack of probable cause, the converse is not true; that is, lack of probable cause may not be inferred from proof of malice. *Hunter v. Beckley Newspapers Corp.,* 129 W. Va. 302, pts. 3 and 4 syl., 40 S. E. 2d 332. ''If there was probable cause, the existence of express malice is immaterial.'' *Bailey v. Gollehon,* 76 W. Va. 322, pt. 3 syl., 85 S.E. 556. ''The question of probable cause or the absence of it is in no sense dependent on the guilt or innocence of accused, but depends on the prosecutor's honest belief in such guilt based on reasonable grounds; * * *.'' 54 C.J.S., Malicious Prosecution, Section 27, page 986. See also *Page v. Wilson,* 168 Va. 447, 191 S. E. 678; *Barton v. Camden,* 147 Va. 263, 137 S. E. 465; *Bailey v. Gollehon,* 76 W. Va. 322, 329, 85 S. E. 556, 559. On the question of probable cause, the facts, circumstances, knowledge and information must be viewed from the standpoint of the defendant, rather than from the standpoint of the plaintiff. *Porter v. Mack & Boren,* 50 W. Va. 581, pt. 15 syl., 40 S. E. 459. ''A prosecutor is not required, before instigating a criminal prosecution, to verify each item of information, or to investigate the crime, or to exhaust all sources of information; it is sufficient if he acts with such caution and diligence as a reasonably prudent man would have to ascertain the truth.'' 54 C.J.S., Malicious Prosecution, Section 30b, page 990. ''In determining whether there was probable cause for instituting a criminal prosecution, only those facts and circumstances which were, or should have been, known to the prosecutor at the time he instituted the prosecution should be considered.'' 54 C.J.S., Malicious Prosecution, Section 30c, page 991.

Questions of fact are normally for the jury, but a verdict of a jury ''which is without evidence to support it, or which is against the clear preponderance of

conflicting evidence, must be set aside upon writ of error." *Lester v. Flanagan,* 145 W. Va., 166, pt. 3 syl., 113 S. E. 2d 87. When the material facts are undisputed and only one inference may be drawn from them by reasonable minds, the factual questions at issue become questions of law for the court. *Brake v. Cerra,* 145 W. Va. 76, pt. 2 syl., 112 S. E. 2d 466. See also *Petros v. Kellas,* (decided October 24, 1961) 146 W. Va. 619, 122 S. E. 2d 177. Similarly in actions for malicious prosecution, the issues of malice and of probable cause may become questions of law for the court where the evidence pertaining thereto is without conflict, or though conflicting to some extent, is of such nature that only one inference may be drawn therefrom by reasonable minds. 54 C.J.S., Malicious Prosecution, Section 97b, pages 1088-92, and Section 99, page 1093; *Thomas v. Beckley Music and Electric Co.,* (decided at the present term of Court), 146 W. Va. 764, 123 S. E. 2d 73; *Hunter v. Beckley Newspapers Corp.,* 129 W. Va. 302, 313, 40 S. E. 2d 332, 338; *Staley v. Rife,* 109 W. Va. 701, pt. 3 syl., 156 S. E. 113; *Wilmer v. Rosen,* 102 W. Va. 8, 12, 135 S. E. 225, 226; *Dowdy v. Redmond,* 113 W. Va. 774, pt. 1 syl., 169 S. E. 477; *Goodman v. Klein,* 87 W. Va. 292, 299, 104 S. E. 726, 729; *Fetty v. Huntington Loan Co.,* 70 W. Va. 688, 693, 74 S. E. 956, 958; *Moats v. Rymer,* 18 W. Va. 642, 647; *Vinal v. Core,* 18 W. Va. 1, pt. 8 syl.

The sufficiency of the evidence to show malice and lack of probable cause was challenged in behalf of the defendant by a motion to direct a verdict for the defendant at the conclusion of the plaintiff's case in chief; by objections to instructions granted in behalf of the plaintiff; by instructions, including particularly a peremptory instruction, offered in behalf of the defendant and refused; and by a motion to set aside the verdict and award the defendant a new trial.

We feel that the evidence is such that the trial court should have held as a matter of law that proof of malice and of lack of probable cause was insufficient to render such issues proper ones for jury determination.

If one in good faith seeks and acts upon the advice of a competent attorney at law in instituting and prosecuting a criminal or civil proceeding, after having made to such attorney a full disclosure of the pertinent facts, he is not subject to liability in a consequent action for malicious prosecution. "A suit, action or proceeding, prosecuted in good faith and on advice of reputable counsel obtained after a fair and accurate disclosure to counsel of the facts on which advice is sought, may not serve as the basis of an action for malicious prosecution." *Hunter v. Beckley Newspapers Corporation*, 129 W. Va. 302, pt. 5 syl., 40 S. E. 2d 332; *Wright v. Lantz*, 133 W. Va. 786, pt. 2 syl., 58 S. E. 2d 123. See also *Spitzer v. Clatterbuck* (Va.), 121 S. E. 2d 466; 12 M. J., Malicious Prosecution, Section 6, page 312; 34 Am. Jur., Malicious Prosecution, Section 71, page 747; 54 C.J.S., Malicious Prosecution, Section 46, page 1010. "In an action for malicious prosecution, where the defendant relies on advice of counsel to justify his institution of the legal proceedings alleged to have been malicious, he must show not only that he consulted a competent lawyer, to whom he made a full and accurate statement of all the material facts, but also what facts were disclosed to counsel, and that he thereafter instituted such proceedings in good faith in reliance on counsel's advice." *Wilmer v. Rosen*, 102 W. Va. 8, pt. 2 syl., 135 S. E. 225. See also *Hunter v. Beckley Newspapers Corp.*, 129 W. Va. 302, 40 S. E. 2d 332.

We are of the opinion that the principles of law stated immediately above should be applied in this case, notwithstanding the fact that Attorney Frank D. Barrett had not been admitted to the practice of his profession in this state, and notwithstanding the fact that he was regularly employed as an attorney by the defendant. 34 Am. Jur., Malicious Prosecution, Section 76, page 750; 54 C.J.S., Malicious Prosecution, Section 48, page 1012. In the case of *Closgard Wardrobe Co. v. Normandy*, 158 Va. 50, 163 S. E. 355, 81 A.L.R. 511, involving an action for malicious prose-

cution, Closgard Wardrobe Company, the defendant, a Virginia corporation, situated in Arlington County, instituted a criminal prosecution against the plaintiff. From the evidence it appeared that the president of the defendant corporation previously sought the advice of Kenneth N. Parkinson, its regularly retained attorney, who for seven and one-half years previously had been actively engaged in the practice of law in the District of Columbia; and that such attorney in turn discussed the matter with a lawyer in the office of the county prosecuting attorney before a warrant was obtained for the arrest of the plaintiff. Parkinson was subsequently admitted to practice in Virginia, and assisted in representing the defendant in the trial of the malicious prosecution action. The trial court instructed the jury that the rule of law here under discussion could not be applied in that trial in case of the attorney who was not a resident of Virginia. In reversing the judgment of the trial court, the appellate court stated:

"It is to be observed that no limitation is placed on the word 'counsel' in any one of these cases. No distinction is drawn between reliance on advice of private counsel and the advice of a general prosecutor, or on the advice of resident or nonresident counsel. The language employed in the opinions indicates the employment of the word 'counsel' in its broadest sense. This seems to be true generally as indicated by the rule laid down in 38 C. J. at page 430:  * * *

* * *

"* * * Hence by the ruling of the trial court we have presented the anomalous situation of one being incompetent to advise the issuance of the warrant which culminated in the present litigation, and yet competent to defend in this state (by reason of his admission to the bar by the trial court) the very litigation resulting from his incompetent act. This is too provincial an application of the rule. In this era when the standards of the legal profession are being more firmly established on the foundation of legal competency and integrity of character, it would be a step backward to restrict the rule.

"It is inconceivable to us that the advice given by the Honorable John W. Davis, Dean Pound or the Honorable Elihu Root, could not be relied upon as a bar to an action by a litigant in a Virginia court without their first qualifying as practitioners in this state, when without cavil, in a case of this nature, we ofttimes accept the advice of the merest tyro in the profession who has been admitted to the bar.

"Our conclusion is that, if counsel is competent, reputable, and has been regularly admitted to practice law in any state of this Union, then he is qualified, after hearing a full disclosure of the facts, to give advice upon which a criminal warrant may be issued."

From an annotation of the case referred to immediately above in 81 A.L.R. 516, 520, it appears to be a general rule that a defendant in an action for malicious prosecution is not precluded from relying on a defense based on the advice of counsel merely because such counsel is regularly retained or employed by the defendant. The rule has been generally applied also where the attorney consulted is a public prosecutor, such as a county prosecuting attorney of this state. 54 C.J.S., Malicious Prosecution, Section 48b, 1012; *American Ry. Express Co. v. Stephens,* 148 Va. 1, 138 S. E. 496. The evidence discloses that Attorney Barrett had the benefit of the entire file, including the report made by Dibert, and both statements in writing signed by the plaintiff. It does not appear that there was at that time available to the defendant or any of its agents any pertinent information not disclosed to Barrett to form a basis for his advice. We hold, therefore, that such advice of reputable counsel constituted probable cause as a matter of law and a complete defense to the malicious prosecution action.

For an additional reason, we feel that the trial court should have held as a matter of law that the plaintiff failed to establish a lack of probable cause. Such reason is based on the writing admittedly signed by the plaintiff at the police detachment headquarters

at Cannelton on August 7, 1958, which, if genuine, constituted a confession of the plaintiff's guilt of the offense for which the prosecution was later commenced. It does not appear from the record that the plaintiff questioned the genuineness of that writing by any statement to any of defendant's agents or to any other person until he testified as a witness in the trial of this case. The fact of such writing, signed by the defendant in the presence of two witnesses, is admitted. It is reasonable to infer that the defendant's agents knew also that Legursky, Dibert and Baisden were in a position to testify concerning a similar confession made orally to them. Before the defendant's agents went to Fayetteville to confer with the prosecuting attorney, they armed themselves with the original of that writing. Nothing on its face suggested any lack of complete genuineness. We feel that the defendant not only was justified in instituting a criminal prosecution, and that it had probable cause under the circumstances for doing so, but we feel also that it was the duty of the defendant's agents as citizens to bring the case to the attention of the prosecuting attorney and to cooperate in such criminal prosecution as he might deem appropriate. It would be unwise, unreasonable and dangerous for the courts not to afford protection to anybody who might initiate in good faith a criminal prosecution based upon such an apparently genuine confession in writing, signed by the accused person, and taken by competent police officers in the course of the performance of their official duties. In relation to a similar situation in the case of *Rawls v. Bennett,* 221 N. C. 127, 19 S.E. 2d 126, 128, the court stated: "In a very real sense, then, it may be said the plaintiff was the author of the indictment. At least, he furnished 'probable cause' for it."

While the failure of the testimony to show want of probable cause is alone sufficient to defeat recovery by the plaintiff, we are just as firm in our opinion that the trial court should have held as a matter of law that the evidence failed to disclose proof of malice suf-

ficient to render that issue one for jury determination. There was no evidence of ill will, enmity, or unfriendliness toward the plaintiff on the part of any agent or employee of the defendant. Indeed, the evidence scarcely discloses that any of the defendant's agents or employees were personally acquainted with the plaintiff at the time the prosecution was instituted. The defendant being a corporation, malice on its part would necessarily have to exist on the part of its agents or to emanate from their acts or conduct. Approximately six months elapsed from the time the alleged written confession was signed by the plaintiff until he was indicted. In the meantime, the defendant might have procured a warrant for the plaintiff's arrest, but it did not do so. As a matter of fact, the criminal prosecution was not initiated by the defendant's agents or employees in the sense of procuring and signing a warrant or in the sense of giving testimony before the grand jury. The case in this respect differs materially from the case of *Thomas v. Beckley Music and Electric Co., et al.,* (decided at this term of Court,) 146 W. Va. 764, 123 S. E. 2d 73, in which the warrant was personally sworn out before a justice of the peace, without previous advice of counsel. In the instant case, there is nothing to indicate that any steps toward prosecution whatsoever were actually taken by the defendant's agents or employees after the evidence in their hands was left with the prosecuting attorney at Fayetteville in July, 1959. The proceedings before the grand jury were conducted by the prosecuting attorney or his assistant and the testimony on which the indictment was made was given by Trooper Legursky as a law enforcement officer. It is true that the plaintiff's wife testified at the trial that when T. E. Bumgardner was at her home on March 18, 1959, for the purpose of procuring her husband's signature on a note, he stated that "if he didn't fill it out he would prosecute him." Bumgardner denied having made any statement of that nature. In any event, there is no evidence that any further effort was made to obtain repayment of the sum of money in question.

730

There was no evidence upon which the jury could reasonably and properly have determined that the defendant was prosecuting the plaintiff in order to collect money. *McNair v. Erwin,* 84 W. Va. 250, pt. 3 syl., 99 S.E. 454. The verdict of the jury is not supported by the evidence, and should be set aside. *Preston County Coke Co. v. Preston Light and Power Co.,* 146 W. Va. 231, pt. 5 syl., 119 S.E. 2d 420.

For the reasons stated herein, the judgment of the Circuit Court of Fayette County is reversed, the verdict of the jury is set aside, and the defendant is awarded a new trial.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*