664 S.E.2d 146

**Brenda L. STANLEY, Plaintiff Below, Appellant,**

v.

**Suthipan CHEVATHANARAT, Defendant Below, Appellee.**

No. 33666.

Supreme Court of Appeals of West Virginia.

Submitted April 1, 2008.

Decided April 24, 2008.

Norman W. White, Shaffer & Shaffer, Madison, WV, William T. Forester, Logan, WV, for Appellant.

Mark A. Robinson, Ryan A. Brown, Flaherty, Sensabaugh & Bonasso, Charleston, WV, for Appellee.

**PER CURIAM:**

This is an appeal by Brenda L. Stanley, appellant/plaintiff below, from an adverse jury verdict in a medical malpractice action that was tried before a jury in the Circuit Court of Logan County. The case was brought against Dr. Suthipan Chevathanarat, appellee/defendant below (hereinafter "Dr. Chevy"), on the theory that Dr. Chevy failed to obtain informed consent from Ms. Stanley prior to performing surgery on her. In this appeal, Ms. Stanley assigns error to the trial court's denial of her pre-verdict motion for judgment as a matter of law on the single issue of breach of the standard of care. After a careful review of the briefs, record and consideration of the oral arguments by the parties, we affirm.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The relevant facts of this case date back to the early 1990s. During this period, Ms. Stanley began receiving hormone replacement therapy (hereinafter "HRT") under the care of Dr. Rodney Stephens. The HRT was administered to Ms. Stanley in order to offset symptoms caused by the onset of menopause. It appears that in spite of the HRT treatment, Ms. Stanley continued to experience vaginal bleeding. At some point in 1995, Ms. Stanley consulted with Dr. Chevy for the purpose of getting her vaginal bleeding under control.

During the course of Dr. Chevy's treatment of Ms. Stanley, which spanned several years, he unsuccessfully tried various procedures to control her vaginal bleeding, including manipulating her HRT regimen. At some point during Ms. Stanley's treatment with Dr. Chevy, an ultrasound study was performed on her. The ultrasound study indicated that Ms. Stanley had a fibroid tumor in her uterus. Dr. Chevy believed that the fibroid tumor was the source of her continued bleeding.[1]

---

1. A subsequent pathological examination of the uterus revealed that no tumor was actually present in Ms. Stanley's uterus. The error in reporting that a tumor existed was attributed to the radiologist who was responsible for interpreting the ultrasound.

On June 3, 1998, Ms. Stanley met with Dr. Chevy to discuss having a total abdominal hysterectomy performed to remove the tumor. On June 19, 1998, Ms. Stanley signed an "Informed Consent Form" that gave authorization to perform surgery to remove the tumor. Subsequent to the surgery being performed, Ms. Stanley developed complications which resulted in several additional surgeries being performed on her.

In January of 2000, Ms. Stanley filed a medical malpractice action against Dr. Chevy as a result of the post-surgery complications. The complaint alleged various theories of liability involving breach of the standard of care. The case was tried before a jury in 2003. At the close of all the evidence, the trial court granted Dr. Chevy's motion for judgment as a matter of law on the sole issue of informed consent. All other theories of liability went to the jury. The jury returned a verdict in favor of Dr. Chevy on all issues.[2]

Ms. Stanley filed a post-trial motion seeking a new trial. As a consequence of the development of a post-trial conflict of interest involving the trial judge and Ms. Stanley,[3] a new trial judge was appointed to rule on the post-trial motion for a new trial. The new trial judge granted Ms. Stanley a new trial on the sole issue of informed consent.[4]

In 2005, a jury trial was held on the issue of informed consent. At the close of all the evidence Ms. Stanley argued that she was entitled to judgment as a matter of law on the issue of negligence, and that the jury should be required to only determine the issues of causation and damages. The trial court denied the motion for judgment as a matter of law on negligence, and submitted the case to the jury on all issues. The verdict form used by the jury required a specific finding for negligence and causation. The jury returned a verdict finding Dr. Chevy did not breach the standard of care and therefore never reached the issue of causation. This appeal followed.

2. No issue involving the jury's verdict in the first trial is involved in this appeal.

3. It appears that the post-trial conflict of interest concerned the sale of certain property involving the initial trial judge and Ms. Stanley.

## II.

## STANDARD OF REVIEW

In this appeal we are called upon to review the trial court's denial of Ms. Stanley's pre-verdict motion for judgment as a matter of law, under Rule 50(a) of the West Virginia Rules of Civil Procedure, on the issue of breach of the standard of care. This Court applies "a de novo standard of review to the grant or denial of a pre-verdict or post-verdict motion for judgment as a matter of law." *Gillingham v. Stephenson*, 209 W.Va. 741, 745, 551 S.E.2d 663, 667 (2001). *See also Yates v. University of West Virginia Bd. of Trs.*, 209 W.Va. 487, 493, 549 S.E.2d 681, 687 (2001); *Adkins v. Chevron, USA, Inc.*, 199 W.Va. 518, 522, 485 S.E.2d 687, 691 (1997). However, we must review a Rule 50(a) motion "using the same standards as those to be employed by the trial court." *Burch v. Coca–Cola Co.*, 119 F.3d 305, 313 (5th Cir.1997) (citation omitted). *See also* Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure* § 50(a), at 1150 (2006) ("The identical standards imposed on the trial court in assessing a motion for judgment as a matter of law is also binding on the appellate court."). We have indicated that a motion for "judgment as a matter of law should be granted at the close of the evidence when, after considering the evidence in the light most favorable to the nonmovant, only one reasonable verdict is possible." *Waddy v. Riggleman*, 216 W.Va. 250, 255, 606 S.E.2d 222, 227 (2004) (citation omitted). In addition, "[u]pon a motion for [pre-verdict judgment as a matter of law], all reasonable doubts and inferences should be resolved in favor of the party against whom the verdict is asked to be directed." Syl. pt. 5, *Wager v. Sine*, 157 W.Va. 391, 201 S.E.2d 260 (1973). Stated more pointedly,

4. As will be discussed later in this opinion, the informed consent issue involves whether or not Dr. Chevy informed Ms. Stanley that, as an alternative to having surgery, she could elect to continue HRT.

in reviewing a motion for judgment as a matter of law, a court should (1) resolve direct factual conflicts in favor of the non-movant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

Cleckley, et al., *Litigation Handbook* § 50(a)(1), at 73 (Cum.Supp.2007) (footnote omitted). With these standards in view, we turn to the issue presented on appeal.

## III.

## DISCUSSION

■ This case was prosecuted by Ms. Stanley under the theory that Dr. Chevy failed to obtain her informed consent prior to performing a total abdominal hysterectomy on her. Regarding the liability theory of informed consent, this Court has held the following:

A physician has a duty to disclose information to his or her patient in order that the patient may give to the physician an informed consent to a particular medical procedure such as surgery. In the case of surgery, the physician ordinarily should disclose to the patient various considerations including (1) the possibility of the surgery, (2) the risks involved concerning the surgery, (3) alternative methods of treatment, (4) the risks relating to such alternative methods of treatment and (5) the results likely to occur if the patient remains untreated.

Syl. pt. 2, *Cross v. Trapp*, 170 W.Va. 459, 294 S.E.2d 446 (1982). In this appeal, we are asked to address only the third element under *Cross*, i.e., informing a patient of alternative methods of treatment.

Ms. Stanley contends that "it is crystallized in the record that Dr. Chevy did not discuss or offer HRT as an alternative meth-

od of treatment."[5] To support this argument, Ms. Stanley contends that "Dr. Chevy himself admitted that he did not offer HRT to her." As a consequence of Ms. Stanley's interpretation of the evidence, she contends that she was entitled to judgment as a matter of law on the issue of negligence, and that the jury should have been allowed to consider only the issues of causation and damages. If the evidence was as "crystal clear" as Ms. Stanley contends, we would agree with her. However, for the reasons that follow, we cannot subscribe to Ms. Stanley's view of the evidence.

During the trial of this case. Ms. Stanley gave the following testimony regarding whether Dr. Chevy had informed her of alternative methods of treatment:

Q. If you look at the [informed consent] form, Ms. Stanley, the four corners of the form, it appears to me, and you tell me if you agree, that's [sic] there [sic] two alternatives, the abdominal total hysterectomy or a total hysterectomy done by vaginal route rather than opening up your abdomen. Correct?

A. That's what it says I guess.

Q. And other than those two things there, did he discuss anything else with you about possible alternatives?

A. He only talked to me about total abdominal hysterectomy.

Ms. Stanley contends in her brief that Dr. Chevy testified that he did not inform her that HRT was an alternative to surgery. However, in our review of the record we do not find Dr. Chevy provided such testimony.[6] The following exchange is the relevant testimony by Dr. Chevy on the issue of alternative treatment:

Q. Now we've talked somewhat about the consent form, Doctor, I want to ask you about this. I think you can see this. I want to just ask you to go through this. I know Mr. White had asked you some questions about this, and instead of bela-

---

**5.** It has been previously pointed out that, prior to the surgery, Dr. Chevy had in fact unsuccessfully treated Ms. Chevy with HRT.

**6.** Dr. Chevy correctly pointed out in his brief that Ms. Stanley took passages of his testimony out of context in order to make it appear as though he testified that he did not inform her that HRT was an alternative to surgery.

boring the point, let me ask you directly. Did you discuss this consent form and its contents with Ms. Stanley?

A. Yes.

Q. And was that on June 19, 1998?

A. Yes.

Q. Now is it fair to say that you don't have a detailed recollection of everything you discussed?

A. No, definitely not. It's been seven years.

Q. You've been performing surgery since 1974. Correct?

A. Yes.

Q. And when you meet with your patients, do you discuss each of these points in the consent form?

A. Yes.

. . . .

Q. In this form you discussed the fact that you could take, you can go through the vagina to do the surgery. Right?

A. Yes.

Q. And below that, you indicated that you further discussed the risks involved in not undergoing the treatment, including not to have the surgery. Correct?

A. Yes.

Q. If Ms. Stanley did not have the surgery, if she elected not to have total abdominal hysterectomy, what would her continued course of treatment be?

A. She can either quit taking hormone or continue taking hormone and take the bleeding again.

Q. And you indicate here that the risk is continued bleeding. Correct?

A. Yes.

. . . .

Q. Dr. Chevy, when you obtain informed consent from your patients, is it your habit and routine practice to go through this informed consent sheet with all your patients?

A. Yes.

Q. Do you believe you did that with Mrs. Stanley?

A. Yes, I do.

■ Dr. Chevy contends on appeal that the above testimony provides an express statement that he informed Ms. Stanley that HRT was an alternative to surgery. We do not believe that this testimony provides such an express statement. However, it could be reasonably inferred from the questions and answers that Dr. Chevy informed Ms. Stanley that HRT was an alternative to surgery.

■ In addition to the conflicting testimony of Ms. Stanley and Dr. Chevy, there was also conflicting expert testimony presented to the jury on the issue of breach of the standard of care. Ms. Stanley's medical expert, Dr. Robert Dein, testified on direct examination as to the standard of care as follows:

Q. Is it your opinion that failing to offer, if indeed there was a failure to offer, continuation of the hormone replacement therapy with the changes you described to the jury, the failure to do that is a breach in the standard of care regarding informed consent?

A. It is, and one point that really hasn't been brought up is that when you make a change hormonally, it often takes a good three months till you really see what the total effect is going to be. I always tell my patients, you know, we're going to do this change. Don't even think about it for the first three months, and then we're going to know if we're on the right track. So when you make a change on May the 1st and make a decision to do a hysterectomy on June the 3rd, once again, informed consent would be telling the patient that an option is simply to keep going, don't change anything, wait till August or September, and see where we are with bleeding.

. . . .

Q. Dr. Dein, let me make sure again that the jury understands. Your criticism and your opinions of a deviation from the accepted care in this case are limited to informed consent and the fact that Dr. Chevy did not offer viable alternative methods of treatment to Brenda, including manipulation or changing the hormone replacement therapy or stopping it altogether.

A. Yes.

The testimony by Dr. Dein made clear that he was of the opinion that Dr. Chevy breach-

ed the standard of care. However, on direct examination Dr. Chevy's medical expert, Dr. Charles March, disagreed with Dr. Dein as follows;

Q. Do you agree with Dr. Dein that Dr. Chevy deviated or broke from the standard of care with respect to this issue of hormone replacement therapy?

A. Absolutely not.

. . . .

Q. And Dr. Dein's criticism is that Dr. Chevy, first of all, didn't indicate that continued hormone replacement therapy would be appropriate, but you see on this form that Dr. Chevy has written not to have surgery. Correct?

A. Yes, sir.

Q. She's on hormone replacement therapy and has been on it for five years. Right?

A. Yes, sir.

Q. And it's reasonable for the physician, if the patient doesn't want to have surgery, to continue the hormone replacement therapy. Correct?

A. Yes, sir.

Q. You heard Dr. Dein's testimony regarding what he would have offered in terms of an alternative. Correct?

A. Yes.

Q. And I believe it was, and correct me if I'm wrong, Doctor, keeping her on the hormone replacement therapy for another three months.

A. Right.

Q. Is that correct?

A. Yes.

Q. What are your opinions regarding that criticism?

A. Medical literature would not support it, although he certainly is correct when he says when you do a fresh start, that's the word, or a fresh juggle of hormone replacement therapy, that let's give it a run for about three months, and he's absolutely right and I was really glad to hear that because that shows good caution. But that is not that three month story which has come out of some wonderful research from Scandinavia that three month story does not apply when it follows immediately a D&C, and specifically the work by Neilson and Rivoe, two folks from Sweden with just some incredibly elegant studies, have shown that that does not apply. So overall, sure, but when you focus on this person, D&C today, went back on some hormones and was still bleeding, it doesn't apply. It's wrong. It's just wrong.

. . . .

Q. Is it your opinion to a reasonable degree of medical certainty that this informed consent form was appropriate?

A. Yes.

Q. And is it your opinion likewise to a reasonable degree of medical certainty that Dr. Chevy met the standard of care in all respects with regard to informed consent?

A. Yes, sir.[7]

(Footnote added).

■ In view of the conflicting testimony by Ms. Stanley and Dr. Chevy, and their respective experts, we believe that the trial court correctly denied Ms. Stanley's pre-verdict motion for judgment as a matter of law on the issue of breach of the standard of care. Our case law is clear in holding that " '[i]t is the peculiar and exclusive province of the jury to weigh the evidence and to resolve questions of fact when the testimony of witnesses regarding them is conflicting[.] Syllabus Point 2, [in part,] *Graham v. Crist,* 146 W.Va. 156, 118 S.E.2d 640 (1961).' " Syl. pt. 2, in part, *Faris v. Harry Green Chevrolet,*

7. During cross examination of Dr. March by counsel for Ms. Stanley, the following testimony was given:

Q. And in order for a patient to make an intelligent and informed choice about a course of treatment, whether to have a total abdominal hysterectomy, we're talking about Ms. Stanley, of course, would a doctor necessarily have to present this HRT as an alternative to surgery?

A. Sure.

Q. So that is something that Dr. Chevy should have talked to her about prior to the total abdominal hysterectomy in order that she would have informed consent or give informed consent. Correct?

A. Sure.

Q. Is that something that, I guess, he didn't put on the form. Correct? That would be under the including. Right?

A. If he wanted to be all-inclusive, yes.

*Inc.*, 212 W.Va. 386, 572 S.E.2d 909 (2002). *See also* Syl. pt. 5, *Hatten v. Mason Realty Co.*, 148 W.Va. 380, 135 S.E.2d 236 (1964) ("Questions of negligence ... present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them.").

## IV.

### CONCLUSION

In view of the foregoing, we find that the circuit court properly denied Ms. Stanley's pre-verdict motion for judgment of a matter of law. Consequently, the judgment entered in favor of Dr. Chevy is affirmed.

Affirmed.