721 S.E.2d 541

**NORFOLK SOUTHERN RAILWAY COMPANY, Norfolk Southern Corporation, James D. Farley, and Charles Paxton, Petitioners Below, Petitioners**

v.

**James W. HIGGINBOTHAM, Respondent Below, Respondent.**

No. 101499.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 27, 2011.

Decided Nov. 23, 2011.

Scott K. Sheets, Esq., Huddleston Bolen, Huntington, WV, James S. Whitehead–PHV, Sidley Austin, LLP, Chicago, IL, for Petitioners.

Marvin W. Masters, Esq., The Masters Law Firm, Charleston, WV, David L. White, Esq., Law Office of David L. White, Charleston, WV, for Respondent.

BENJAMIN, Justice:

This case is before the Court upon the appeal of the defendants below Norfolk Southern Railway Company, Norfolk Southern Corporation, James D. Farley, and Charles Paxton (hereinafter "petitioners"). In this malicious prosecution case, the petitioners appeal from the March 24, 2010, final order of the Circuit Court of Mason County, in which the circuit court denied their post-trial motions for judgment as a matter of

law, a new trial, and remittitur. The petitioners contend, *inter alia*, that the circuit court erred in not granting its motions because the court incorrectly found at trial that the petitioners had procured the prosecution of the plaintiff below, James W. Higginbotham (hereinafter "respondent"), as a matter of law. After a thorough review of the record presented for consideration, the briefs, the legal authorities cited, and the arguments of the petitioners and the respondent, we find that the circuit court committed reversible error by determining as a matter of law that the petitioners procured the malicious prosecution of the respondent. We therefore reverse the circuit court's order denying the petitioners' post-trial motions and remand this case for proceedings consistent with this opinion.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

The respondent has worked for various railroads since 1964. He became an employee of Norfolk Southern Corporation in 1998 when the railroad he was working for at the time, Conrail, merged with Norfolk Southern Corporation. The respondent was also the part owner of a construction business, RJW Construction (hereinafter "RJW"), for which he worked for 27 years. RJW's business consisted primarily of installing and maintaining rail road tracks for private plants, coal facilities, and similar ventures. RJW often bought rail and other equipment to construct tracks.

This case arose from the petitioners' accusation that the respondent stole rail the petitioners claimed to own. The rail in question was located in a remote area of Kanawha County known as Blue Creek.[1] The alleged scheme to steal the Blue Creek rail revolved around the activities of four men: the respondent; the respondent's longtime business associate and local scrap rail dealer, Charles Chandler; a rail dealer from Florida who had previously dealt with the respondent, David Clark; and a CSX employee, Thomas Crawford.

According to the respondent, Mr. Crawford forged a document indicating that CSX claimed ownership of the Blue Creek rail and that it authorized the removal and sale of the rail. In May of 2000, Mr. Chandler paid Mr. Crawford cash for the forged document with the knowledge that the document was forged. Mr. Chandler presented the document to the respondent, and the respondent agreed to broker the sale of the Blue Creek rail between Mr. Chandler and Mr. Clark. Mr. Chandler used one of RJW's backhoes to remove the rail. The respondent brokered the sale of a portion of 105 pound rail[2] to Mr. Clark for $10,000. Mr. Clark also paid the respondent $6,500 for inspecting the rail on his behalf. Additionally, the respondent paid Mr. Chandler $10,000 for a portion of 127 pound rail.

Sometime after the commencement of the removal of the Blue Creek rail, a Norfolk Southern supervisor, Mark Lonsinger, became aware that the Blue Creek rail was being removed and sold.[3] Mr. Lonsinger informed the Norfolk Southern Division Engineer, Phillip Merilli, that he had a report that CSX was selling the rail. In response, Mr. Merilli sent Mr. Lonsinger to Blue Creek to investigate the removal and sale of the Blue Creek rail which Mr. Merilli believed Norfolk Southern owned, not CSX. Mr. Lonsinger found Mr. Chandler removing

1. The section of the Blue Creek rail at issue here had not been in use for more than 20 years before its removal.

2. Not all rail is made alike. The different types of rail are usually measured and described in pounds per yard. "Pounds per yard" is often abbreviated simply to "pounds." Thus, "105 pound rail" refers to rail that is 105 pounds per yard of rail.

3. The parties dispute exactly how Mr. Lonsinger became aware of the removal of the rail. The

circuit court's March 24, 2010, order states that "[t]he jury heard evidence that the only reason the defendants knew the rail was being removed at all was because the Plaintiff, their long-time employee, told them." The petitioners state in their brief to this Court, "... Higginbotham mentioned to NS Track Supervisor Mark Lonsinger ... that he had heard *CSX* was selling rail at Blue Creek. *This statement was not truthful,* as Higginbotham knew that Chandler, and *not* CSX, was "selling" the rail...." (Emphasis in original) (internal citation omitted).

the rail, at which time Mr. Chandler presented the forged CSX document to Mr. Lonsinger.

Upon receiving Mr. Lonsinger's report that the rail was actually being removed and sold, Mr. Merilli sent Mr. Lonsinger back to Blue Creek with Norfolk Southern Police Department Special Agent Paxton for additional investigation.[4] Upon discovering that the respondent was involved in the removal and sale of the rail, Lonsinger took the respondent out of service for Norfolk Southern, and a formal investigatory hearing was held. After a hearing in 2000, the respondent's employment was terminated; however, an arbitration panel[5] reinstated his employment in 2001.[6]

After the arbitration panel reinstated the respondent's employment, the Norfolk Southern officers submitted the matter to the assistant prosecutor, Robert Schulenberg. Between his receipt of the matter and his submission of the case to a grand jury two years later, Norfolk Southern police contacted Mr. Schulenberg approximately once per month, totaling 29 calls. The petitioners claim that the frequency of the calls is in accordance with standard practice for the Norfolk Southern police. At his request, the petitioners provided Mr. Schulenberg with assistance by gathering additional facts. Norfolk Southern also provided written statements taken from Mr. Chandler, Mr.

Crawford, and Mr. Lonsinger; the Norfolk Southern police report; and documentary evidence found in the respondent's company vehicle. Mr. Schulenberg then presented the case to the grand jury to pursue indictments against the respondent, Mr. Clark, and Mr. Crawford.[7]

The petitioners acknowledged that an error was made by the Norfolk Southern police in their report which indicated that the respondent, instead of Mr. Chandler, had dealt directly with Mr. Crawford in procuring the forged CSX document. The petitioners also acknowledge that upon presenting the case to the grand jury, Norfolk Southern's Special Agent Farley[8] made erroneous statements about the events surrounding the case to the grand jury.[9] The respondents contend, however, that Special Agent Farley's statements were made from his memory of the events and that he believed at the time that the statements were truthful.

The Kanawha County grand jury indicted the respondent, Mr. Chandler, and Mr. Clark. The respondent was never arrested or incarcerated, and a $500 bond he posted was ultimately returned to him. The indictments against the three men were all dismissed over a year later.[10] The respondent then pursued the malicious prosecution suit which underlies this appeal.

The trial of the malicious prosecution claim began on August 28, 2007. At the close of

---

4. Under W. Va.Code § 61–3–41, railroad special police officers are commissioned by the Governor and have the authority of deputy sheriffs.

5. The arbitration panel was a neutral Public Law Board created pursuant to the Railway Labor Act, 45 U.S.C. §§ 151–164. (1996).

6. The circuit court's March 24, 2010, order states that the arbitration panel found that the respondent "did not knowingly steal the rail." The record indicates that although the respondent's employment was reinstated, the year he was off of work was deemed a suspension during which time he received no back pay.

7. Mr. Schulenberg testified at trial in the malicious prosecution proceeding that he alone made the decision to pursue prosecution against the respondent. He stated that he decided what evidence to subpoena, whether there was probable cause to present the case to the grand jury, which witnesses to subpoena to testify before the

grand jury, and what charges to seek in the grand jury indictments.

8. Special Agent Farley replaced Special Agent Paxton as the Norfolk Southern officer assigned to the Blue Creek rail case when Special Agent Paxton retired on December 31, 2000.

9. Special Agent Farley testified that Mr. Clark had written a check for $10,000 to the respondent for the rail, when in actuality no such check existed; the check to which Special Agent Farley referred was written by Mr. Clark to Mr. Chandler. He also stated that the rail removal scheme resulted in the removal of 105 pound rail and 107 pound rail, which was also incorrect. The rail in question was 105 pound rail and 127 pound rail.

10. The record shows that the charges were dismissed by the Circuit Court of Kanawha County which found, *inter alia,* the rail at issue in the case had been abandoned as a matter of law.

the respondent's case in chief, the respondent moved for a judgment as a matter of law on the issue of whether the petitioners had procured his prosecution, which is one element of his required proof. The petitioners simultaneously moved for a complete judgment as a matter of law. The circuit court denied the petitioners' motion, but it granted the respondent's motion. At that time the petitioners had not presented their case in chief. The petitioners again moved for judgment as a matter of law at the close of the trial. Again the circuit court denied the motion. The court instructed the jury as to the finding of procurement as a matter of law, but it submitted the questions as to the other elements of malicious prosecution at issue—probable cause and malice—to the jury.

The jury returned a verdict in favor of the respondent. The verdict included an award of $420,000 in damages. The circuit court entered the judgment order in favor of the respondent on December 4, 2007. On December 17, 2007, the respondents filed a motion for judgment as a matter of law, new trial, or remittitur. Two and a half years later, on March 24, 2010, the circuit court entered a final order denying the petitioners' post trial motions. In its final order, the circuit court found "that the undisputed evidence indicates that the defendants did in fact procure the prosecution." The circuit court supported its conclusion by referencing the error in the police report that Norfolk Southern provided to the assistant prosecutor and the false testimony given to the grand jury which the court believed "placed Mr. Higginbotham even more squarely into the mix and made it appear he was guilty of theft and was getting paid for it." The circuit court continued by stating that "the defendants adduced no evidence whatsoever to support that conclusion." The court then made reference to facts presented at trial that it believed indicated that the petitioners' actions toward the respondent were intended to "get Mr. Higginbotham indicted and convicted to take him off their payroll."

The petitioners now appeal the circuit court's final order denying their motions.

## II.

## STANDARD OF REVIEW

The petitioners seek relief from the circuit court's order denying their motions for judgment as a matter of law, new trial, or remittitur. The errors giving rise to these motions, they claim, are the result of the circuit court's finding that as a matter of law, the petitioners had procured the prosecution of the respondent.

This Court "appl[ies] a *de novo* standard of review to the grant or denial of a pre-verdict or post-verdict motion for judgment as a matter of law." *Gillingham v. Stephenson,* 209 W.Va. 741, 745, 551 S.E.2d 663, 667 (2001). With this standard in hand, we turn now to the case at bar.

## III.

## DISCUSSION

■ The dispositive issue raised by the petitioners here is whether the circuit court correctly held as a matter of law that the petitioners procured the malicious prosecution of the respondent. Procurement is an element of malicious prosecution. We note at this point that this Court has articulated in two separate lines of cases delineating the elements of malicious prosecution. The first line of cases uses a three element rule: " 'To maintain an action for malicious prosecution it is essential to prove (1) that the prosecution was malicious, (2) that it was without reasonable or probable cause, and (3) that it terminated favorably to plaintiff.' Syl. pt. 1, *Lyons v. Davy-Pocahontas Coal Co.,* 75 W.Va. 739, 84 S.E. 744 (1915)." Syl. pt. 1, *Preiser v. MacQueen,* 177 W.Va. 273, 352 S.E.2d 22 (1985). In the second line of cases, this Court has held that

"[i]n an action for malicious prosecution, plaintiff must show: (1) that the prosecution was set on foot and conducted to its termination, resulting in plaintiff's discharge; (2) that it was caused or procured by defendant; (3) that it was without probable cause; and (4) that it was malicious. If plaintiff fails to prove any of these, he can not recover." *Radochio v. Katzen,* 92 W.Va. 340, Pt. 1 Syl. [114 S.E. 746].

Syl. pt. 3, *Truman v. Fidelity & Casualty Co. of New York,* 146 W.Va. 707, 123 S.E.2d 59 (1961).

At first blush, these two rules seem inconsistent in that the *Preiser* rule does not specifically state that procurement is an element of malicious prosecution that must be proved. However, the Court noted in *Preiser* that the definition of "malicious prosecution" in Black's Law Dictionary 864 (5th ed.1979), is consistent with the rule provided in its first syllabus point. *Preiser,* 177 W.Va. at 275 n. 3, 352 S.E.2d at 24 n. 3. That definition provides as follows:

> Elements of a cause of action for malicious prosecution are: (1) commencement of prosecution of proceedings against present plaintiff; (2) its legal causation by present defendant; (3) its termination in favor of present plaintiff; (4) absence of probable cause for such proceedings; (5) presence of malice therein; and (6) damage to plaintiff by reason thereof.

In Black's Law Dictionary's definition, the first two elements are equivalent to the meaning of procurement.[11] Because the Court found that the definition of malicious prosecution is consistent with its first syllabus point in *Preiser,* it is clear that the three-part rule in its first syllabus point embodies the element of procurement. Therefore, we hold that the rules delineating the elements of a malicious prosecution claim in syl. pt. 1, *Preiser v. MacQueen,* 177 W.Va. 273, 352 S.E.2d 22 (1985), and syl. pt. 3, *Truman v. Fidelity & Casualty Co. of New York,* 146 W.Va. 707, 123 S.E.2d 59 (1961), are the same, and procurement is an inherent element in both.

▮▮▮ As to whether a circuit judge should grant a motion for judgment as a matter of law during trial, Rule 50 of the West Virginia Rules of Civil Procedure controls:

> (a) *Judgment as a matter of law.*—(1) If during trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue

against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

This Court has stated that " '[u]pon a motion for [pre-verdict judgement as a matter of law], all reasonable doubts and inferences should be resolved in favor of the party against whom the verdict is asked to be directed.' Syllabus point 5, *Wager v. Sine,* 157 W.Va. 391, 201 S.E.2d 260 (1973)." Syl. pt. 1, *Stanley v. Chevathanarat,* 222 W.Va. 261, 664 S.E.2d 146. We have further noted that "judgment as a matter of law should be granted at the close of the evidence when, after considering the evidence in the light most favorable to the nonmovant, only one reasonable verdict is possible." *Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 481 n. 6, 457 S.E.2d 152, 158 n. 6 (1995). Thus, judgment as a matter of law is only appropriate when a reasonable person could only reach one conclusion.

In this case, the parties dispute the meaning of "procurement." In its final order, the circuit court found "that the undisputed evidence indicates that the defendants did in fact procure the prosecution." The circuit court supported its conclusion by referencing the error in the police report and the erroneous testimony given to the grand jury. The circuit court then went on to apply our language in *Vinal v. Core,* 18 W.Va. 1, 25 (1881), *superceded by statute on other grounds:* "By instigated and procured is meant instigation and procurement in the ordinary meaning of this language." Other than to state in conclusory fashion that "the fact of the matter is that they instigated and procured Mr. Higginbotham's prosecution-plain and simple," the circuit court does not explain what it believes to be the ordinary meaning of "procurement."

The circuit court cut its procurement analysis short by hanging its hat on the above general "instigation and procurement" language in *Vinal.* *Vinal,* however, provides additional direction as to the meaning of

---

**11.** *See* expanded discussion *infra* on the meaning of "procurement" within our case law.

procurement within the context of a malicious prosecution. The *Vinal* Court states: "[The meaning of procurement is] not that the defendants jointly applied to the justice [of the peace] to issue the warrant against the plaintiff, but that they consulted and advised together, and both participated in the prosecution, which was carried on under their countenance and approval." *Vinal*, 18 W.Va. at 2. Therefore, *Vinal* requires that to have proved procurement in this case, the respondent must have shown that the defendants consulted with and advised each other regarding the prosecution, that the defendants participated in the prosecution, and that the prosecution was carried out under the defendants' countenance and approval.

■ From this meaning of "procurement" in *Vinal*, it is apparent that procurement within the meaning of a malicious prosecution suit requires more than just the submission of a case to a prosecutor; it requires that a defendant assert control over the pursuit of the prosecution. The level of control necessary to prove procurement is not explicitly delineated in our case law, but we have previously addressed the issue of procurement in the context of some of our other malicious prosecution cases. A comparison of the facts and holdings in these cases with the case at bar is illuminating.

In *Vinal*, the Court found that the defendant procured the prosecution of the plaintiff. In that case, the Court recognized that both the prosecutors and the defendants knew that the plaintiff had not stolen rent-oil but that they had him arrested for theft of the oil anyway. *Vinal*, 18 W.Va. at 5. *Vinal* is distinguishable from the case before us. Here, at the time the case was submitted to the assistant prosecutor, there was a question as to whether either the assistant prosecutor or the petitioners knew that the respondent did not knowingly participate in rail theft. There is also the testimony of the assistant prosecutor that he alone, after conducting an investigation, made the decision to seek an indictment against the respondent. The jury could have concluded that the petitioners believed the respondent was involved in stealing the rail in this case, and so it would be reasonable to find that the petition-

ers' control in the prosecution did not rise to the level of procurement.

We also have *Truman v. Fidelity & Casualty of New York*, 146 W.Va. 707, 123 S.E.2d 59 (1961), in which the Court found that the defendant had not procured the prosecution of the plaintiff. In that case, the defendant investigated suspected insurance fraud by the plaintiff. The defendant then submitted the evidence it collected to the prosecutor. The Court said, "there is nothing to indicate that any steps toward prosecution whatsoever were actually taken by the defendant's agents or employees after the evidence in their hands was left with the prosecuting attorney." *Truman*, 146 W.Va. at 729, 123 S.E.2d at 72.

The circuit court claims that *Truman* is factually distinguishable from this case because the petitioners' agent, Special Agent Farley, testified before the grand jury. The respondent also finds the cases factually dissimilar because after the petitioners submitted the evidence they collected to the prosecutor, they called the prosecutor 29 times or approximately once per month about the status of the case. Additionally, the petitioners gathered evidence for the prosecutor at his request.

We find that none of these facts taken individually or together indisputably demonstrates that the petitioners' control over the prosecution of this case amounted to procurement. While Special Agent Farley did testify to the grand jury, the evidence indicates that this was at the request of the assistant prosecutor; there was no evidence presented showing that the petitioners insisted they be provided with the opportunity to testify to the grand jury. As for the 29 phone calls, the evidence shows that these were the result of a standard procedure of the Norfolk Southern police, not an attempt to place pressure on the assistant prosecutor to proceed with an indictment. Finally, the additional evidence collected by the petitioners after the initial submission of the case to the assistant prosecutor was collected at the request of the assistant prosecutor. The assistant prosecutor then used that evidence, according to his testimony, to make an independent decision to prosecute. Based on the

evidence introduced at trial, it is clear that reasonable minds could differ as to whether the petitioners' involvement in the prosecution amounted to procurement. Stated differently, it is reasonable to conclude based upon the facts of this case that the decisions relating to prosecution were in the hands of the prosecution.

Our case law is admittedly limited regarding the explicit meaning and scope of procurement, particularly regarding the amount of control over a prosecution a defendant must have before it can be found to have procured that prosecution. Other jurisdictions, however, have explored the topic in more detail. For instance, in Texas, there is no procurement when "the decision whether to prosecute is left to the discretion of another person, a law enforcement officer or the grand jury.... An exception ... occurs when a person provides information which he knows is false to another *to cause a criminal prosecution.*" *Browning–Ferris Industries, Inc. v. Lieck,* 881 S.W.2d 288, 292 (Tex.1994) (emphasis in original). In Ohio, there is no procurement when "an informer merely provides a statement of his belief of criminal activity and leaves the decision to prosecute entirely to the uncontrolled discretion of the prosecutor." *Robbins v. Fry,* 72 Ohio App.3d 360, 594 N.E.2d 700, 702 (1991). Moreover, the New Mexico Supreme Court has noted that

> citizens must have "wide latitude in reporting facts to authorities so as not to discourage the exposure of crime." *Zamora,* 106 N.M. at 634, 747 P.2d at 929. "Efficient law enforcement requires that a private person who aids the police by giving honest, even if mistaken, information about crime, should be given effective protection from civil liability."

*Weststar Mortg. Corp. v. Jackson,* 133 N.M. 114, 61 P.3d 823, 831 (2002).

■ We find that the meaning of procurement as determined by these other jurisdictions compliments the meaning and the spirit of our law. Therefore, we find that the circuit court prematurely granted the respondent's motion for judgment as a matter of law. The circuit court incorrectly found that there was no legally sufficient evidentiary basis for which the jury could have found that the petitioners had not procured the prosecution of the respondent. The testimony of the assistant prosecutor directly contradicts the proposition that the petitioners had a level of control over the prosecution amounting to procurement. Thus, whether the petitioners procured the prosecution of the respondent is a question of fact, and that the question of procurement should have been submitted to the jury.

Insofar as we have established that the circuit court has erred regarding the issue of procurement and that this case must be remanded for further proceedings, we need not address the petitioners' additional assignments of error.[12]

## IV.

## CONCLUSION

For the reasons set forth above, this Court reverses the circuit court's order entered March 24, 2010, which denies the petitioners' motions for judgment as a matter of law, new trial, or remittitur. We remand this case to the circuit court for a new trial consistent with this opinion.

Reversed and remanded.

12. The petitioners presented a total of 5 assignments of error on which it predicated this appeal:

    1. The Trial Court committed clear error by denying Petitioners summary judgment or judgment as a matter of law, as Petitioners did not procure Respondent's prosecution, there was probable cause for Respondent's prosecution, and the prosecution was not malicious.

    2. The Trial Court committed clear error by denying Petitioners summary judgment or judgment as a matter of law, as Petitioners were entitled to the absolute defense of advice of counsel.

    3. The Trial Court committed clear error by denying Petitioners immunity in the performance of official duties.

    4. The Trial Court committed clear error in allowing the award of compensatory damages to stand, as it had no basis in fact.

    5. The Trial Court committed clear error in upholding the punitive damage award.