STATE OF WEST VIRGINIA

**FILED**

**October 25, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**David Christopher Keffer,**
**Plaintiff Below, Petitioner**

**v.) No. 22-631** (Fayette County 20-C-70)

**Fayette County Board of Education,**
**Defendant Below, Respondent**

# MEMORANDUM DECISION

Petitioner/plaintiff below, David Christopher Keffer (hereinafter "petitioner"), appeals the Circuit Court of Fayette County's grant of summary judgment to respondent/defendant below, Fayette County Board of Education (the "Board"), in this retaliatory discharge case.[1] Petitioner was terminated from his position as the Board's Director of Operations after he was discovered removing copper piping from the ceiling of a closed school building and selling it for scrap—conduct for which he was subsequently indicted, culminating in a pretrial diversion agreement. Petitioner claims he was merely using his discretionary authority to recoup funds from a soon to be demolished school for the use of his department and was actually terminated as retaliation for whistleblower activity involving the spouse of the Board's Director of Personnel.

The circuit court granted summary judgment to the Board, finding that petitioner failed to create a genuine issue of material fact disputing the Board's legitimate, non-discriminatory reason for his termination. The circuit court more specifically found that 1) petitioner's claim under the West Virginia Human Rights Act ("HRA") failed because he did not allege or establish that he was a member of a protected class; 2) his common law "*Harless*"[2] discharge claim failed because he offered no evidence that the decisionmakers involved in his termination were aware of his alleged whistleblower activity; and 3) his malicious prosecution claim failed because the Board neither "procured" his prosecution nor was his pretrial diversion agreement a "favorable" outcome.

This Court has carefully considered the briefs and oral arguments of the parties, the submitted record, and the pertinent authorities. Upon review, we find no error in the circuit court's

---

[1] Petitioner appears by counsel Anthony M. Salvatore, Hewitt & Salvatore, PLLC. Respondent Board appears by counsel Chip E. Williams and Jared C. Underwood, Pullin, Fowler, Flanagan, Brown & Poe, PLLC.

[2] *See Harless v. First Nat'l Bank*, 162 W. Va. 116, 246 S.E.2d 270 (1978).

grant of summary judgment to the Board. Because there is no substantial question of law and no prejudicial error, a memorandum decision is appropriate pursuant to Rule 21 of the West Virginia Rules of Appellate Procedure.

## I. Factual and Procedural History

Petitioner was an eighteen-year Board employee and had served as Director of Operations for approximately four years at the time of his termination in 2018. As Director of Operations his duties included overseeing maintenance of buildings, staffing of the maintenance department, budgeting, and general facilities oversight. In mid- to late-May 2018 two IT employees observed disturbed ceiling tiles and pipe wrapping at the closed Collins Middle School and, due to concerns about asbestos disturbance, reported it to Maintenance Supervisor and asbestos management planner Jack Herron. Mr. Herron reviewed surveillance video of the areas, which showed petitioner accessing the ceiling with a ladder and saw, removing copper piping, and disturbing asbestos in the pipe wrapping—all without utilizing proper asbestos protocols.[3] Because petitioner was his direct supervisor, Mr. Herron sought guidance from Assistant Superintendent Gary Hough regarding petitioner's removal of the copper piping and lack of asbestos protocols, advising that he was required to report the apparent asbestos disturbance to state and federal environmental agencies. Mr. Hough then reviewed the surveillance footage with Director of Personnel Margaret Pennington and contacted Superintendent Terry George, who then contacted the Board's general counsel. The Board's counsel recommended petitioner be placed on administrative leave and the Fayette County Sheriff's Department be contacted to investigate whether petitioner sold the removed copper piping.

On June 4, 2018, petitioner met with Ms. Pennington and was notified that he was being placed on administrative leave for "alleged criminal activity." Later that day, petitioner's Board vehicle was retrieved by Mr. Hough and a sheriff's deputy; he was then more specifically advised that he was alleged to have stolen copper pipe from Collins Middle School. Petitioner immediately contacted Mr. Herron and told him there was money in his desk drawer and asked that Mr. Herron "hold it for him" because the Board was "trying to set him up"—which request Mr. Herron immediately reported to Mr. Hough. On June 11, 2018, Mr. George and Ms. Pennington again met with petitioner, along with his counsel, during which the specific allegations were discussed, and petitioner asserted his Fifth Amendment privilege against self-incrimination, offering no explanation for his alleged activity.

The ensuing police investigation uncovered security footage showing petitioner cutting down, stripping insulation from, and removing copper piping from the hallways of the closed school on three separate occasions. The investigation further revealed that petitioner then sold the copper piping for scrap at a local recycling company for a total of $853.85, as evidenced by receipts. Signed documentation accompanying the sales further indicate that petitioner identified himself as the "seller" of the copper and contained his certification that he was the "owner of the

---

[3] The employees had also observed similar disturbances to the piping in the gymnasium, but that area is not under video surveillance.

2

scrap metal being sold or ha[d] signed authorization from the owner to sell said scrap metal."[4]  The Board's records reflected that on the day of the final sale petitioner was utilizing a vacation day. Representatives of the Board advised the investigating officer that petitioner was not authorized to cut or remove copper piping from the school and had not deposited any of the funds with the Board. A total of $768.00 in cash was recovered from petitioner's office desk.

After the police investigation was concluded, a third meeting was held on June 26, 2018, during which petitioner was advised he was being recommended for termination.  At the July 17, 2018, Board meeting, Board counsel presented the results of the investigation and the Board voted to terminate petitioner.  Petitioner did not appear at the meeting, despite being provided notice. During discovery below, the Superintendent repeatedly testified that he was acting on "advice of [the Board's] counsel" throughout the investigation and in recommending termination.

An arrest warrant for petitioner was obtained and, during his preliminary hearing, a magistrate found probable cause and bound the matter over to the grand jury.  On January 9, 2019, a grand jury returned a five-count felony indictment against petitioner including three counts of entering without breaking, one count of destruction of property, and one count of grand larceny. Petitioner's criminal trial commenced on August 22, 2019, but a mistrial was declared shortly after opening statements.[5]  On March 16, 2020, an agreed order was entered reflecting that petitioner's indictment was dismissed without prejudice upon the parties' representation that petitioner agreed to enter into a pretrial diversion in magistrate court; the order further provided that if petitioner failed to complete his pretrial diversion the State would not be barred from refiling charges. Petitioner represents—and the Board does not challenge—that he has successfully fulfilled his pretrial diversion requirements.

On March 18, 2022, petitioner filed the underlying action for retaliatory discharge. Specifically, petitioner asserts three causes of action:  1) "unlawful retaliation" under the HRA and the common law for engaging in the "protected activity" of "complaining about . . . unlawful activities"; 2) "hostile work environment and harassment" under the HRA; and 3) malicious prosecution.  During discovery, petitioner admitted to removal of the copper, but asserted that it was his intention to use the scrap money to purchase t-shirts for the maintenance crew; he claimed to have the design for the t-shirts on his computer and a list of the men's sizes on his desk.[6]

_____

[4] Mr. Herron testified that he had previously been involved in scrapping materials for resale as part of his duties at the Board; however, when doing so he always listed the Board as the owner of the materials and took the cash and receipt to the Board office for deposit into the general fund.

[5] Petitioner's criminal defense counsel argued that the State could not establish that Collins Middle School was owned by the county due to a reversionary clause in the deed which allegedly provided that when the property ceased being used as a school, it would revert to predecessors in title.

[6] Mr. Herron testified that on the morning of petitioner's initial meeting with Mrs. Pennington, petitioner inquired about Mr. Herron's t-shirt size and indicated he was going to buy t-shirts for the maintenance crew.  Mr. Herron testified he found this suspicious as the Board did (continued . . .)

3

Petitioner contended that part of his job was saving the county money on building equipment and materials and that he had discretion to determine the best way to do so. Petitioner likened his copper scrapping to his efforts to "repurpose" boilers from Collins Middle School for other school buildings and trading in a chiller unit from Oak Hill High School, allegedly saving the county several hundreds of thousands of dollars. He further contended he "repurposed and reused" materials from other closed schools including toilets, lights, sinks, and hardware. Petitioner testified that Mr. George had repeatedly directed him to get Collins Middle School "ready for demolition"; Mr. George confirmed that petitioner was not required to obtain permission or report every decision he made in order to effectuate his job duties.

In support of his allegations of retaliatory discharge, petitioner testified that he believed he was terminated due to his report of "theft and misconduct" by Denton Pennington—a plumbing instructor at the Fayette Institute of Technology ("FIT") and husband of the Director of Personnel, Mrs. Pennington. Petitioner claims that in January or February 2018, he took a spare vehicle bumper to the FIT to be used as a replacement on a matching county vehicle; shortly thereafter, petitioner was advised that Mr. Pennington had inquired about the bumper, which was then discovered missing. Petitioner alleges that he was then coincidentally traveling behind Mr. Pennington's vehicle (which had previously been missing a bumper) and observed the replacement bumper on his vehicle. Petitioner testified that he contacted the FIT principal, Barry Crist, and informed him that Mr. Pennington may have taken the bumper. Petitioner testified that he was later advised that Mr. Pennington denied taking the bumper, that the bumper reappeared the following day, and Mr. Pennington resigned shortly thereafter.[7] Mr. George denied any knowledge of this alleged incident prior to petitioner's termination. Mrs. Pennington likewise denied knowledge of the incident and further denied that her husband took the replacement bumper.

After the close of discovery the Board moved for summary judgment, which the circuit court granted, finding no genuine issue of material fact. As to petitioner's HRA claim, the circuit court found that he failed to assert that he was a member of a protected class. As to his common law retaliatory discharge claim, the circuit court found in pertinent part that because the decisionmakers involved in the investigation and recommended termination—Mr. George, Mr. Hough, and Mrs. Pennington—had no knowledge of petitioner's alleged whistleblowing, he could not establish retaliation. Finally, the court found that the Board did not "procure" petitioner's prosecution as evidenced by the magistrate's probable cause findings and his subsequent indictment, and that petitioner's pre-trial diversion agreement was not a "favorable outcome" as contemplated for purposes of the claim. This appeal followed.

## II. Standard of Review

_____

not typically provide such items, petitioner was scrupulous with spending, and it had not been mentioned previously.

[7] Petitioner also testified that Mr. George told him earlier in the year that Mrs. Pennington was "not his friend" and recounted an incident where he was alleged to have used profanity to refer to a friend of Mrs. Pennington and that she "tried to get him in trouble" for it.

As is well-established, "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

### III. Discussion

Petitioner advances a single assignment of error: that the circuit court improperly granted summary judgment where genuine issues of material fact exist as to each of his causes of action. We accordingly address each cause of action in turn.

1. *Harless* Claim

It is critical to note at the outset of our discussion that, despite asserting that his discharge was in retaliation for the "protected activity" of whistleblowing, petitioner does not assert a statutory cause of action pursuant to the Whistleblower Law. *See* West Virginia Code § 6C-1-1 to -8. The Whistleblower Law provides for a statutory cause of action for damages and/or injunctive relief for acts taken in retaliation for "whistleblowing" as defined therein: "No employer may discharge, threaten, or otherwise discriminate or retaliate against an employee[] . . . because the employee . . . makes a good faith report[] . . . verbally or in writing, to the employer or appropriate authority, an instance of wrongdoing or waste." *Id*. § 6C-1-3(a).

Instead, petitioner maintains only a common law claim for discharge in contravention of a substantial public policy pursuant to *Harless*. *See* Syl., *Harless*, 162 W. Va. at 116, 246 S.E.2d at 271 ("The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge."). Petitioner argues that the substantial public policy contravened by his discharge is embodied in the Whistleblower Law. This Court has found that statutes which provide for their own cause of action—such as the Whistleblower Law or the HRA—may serve as the substantial public policy underlying a *Harless* claim. *See, e.g., Burke v. Wetzel Cnty. Comm'n*, 240 W. Va. 709, 815 S.E.2d 520 (2018) (finding the HRA, Whistleblower Law, and FMLA to be "[t]he sources of the public policy at issue" for *Harless* purposes); *Roth v. DeFeliceCare, Inc.*, 226 W. Va. 214, 223, 700 S.E.2d 183, 192 (2010) (acknowledging violation of HRA as basis of *Harless* claim). [8]

---

[8] We emphasize this distinction because the circuit court also found—and the parties address in this appeal—that petitioner did not satisfy the required statutory elements contained in the Whistleblower Law. Despite permitting alternative statutory and common law discharge claims, we have never fully examined whether and to what extent a plaintiff who either foregoes or does not qualify for relief under a statutory cause of action must nonetheless satisfy the critical elements of that statute where it is identified as the substantial public policy upon which his or her *Harless* claim is based. *See, e.g., Williamson v. Greene*, 200 W. Va. 421, 490 S.E.2d 23 (1997); *but cf. Herbert J. Thomas Mem'l Hosp. Ass'n v. Nutter*, 238 W. Va. 375, 386, 795 S.E.2d 530, 541 (2016) (discussing *Harless* elements and requiring proof that discharge "would jeopardize the public policy" identified). However, because petitioner's claim fails on a more fundamental level, we find it unnecessary to address that issue in this case.

Therefore, we approach the circuit court's award of summary judgment as outlined in our recent case of *Longerbeam v. Shepherd Univ.*, ___ W. Va. ___, ___ S.E.2d ___, 2024 WL 1571403 (2024). In *Longerbeam*, we explained that the evidentiary burden in retaliation-based employment claims requires a prima facie showing of the following elements:

> "(1) that the complainant engaged in protected activity, (2) that complainant's employer was aware of the protected activities, (3) that complainant was subsequently discharged and (absent other evidence tending to establish a retaliatory motivation) (4) that complainant's discharge followed his or her protected activities within such period of time that the court can infer retaliatory motivation."

*Id.* at ___, ____ S.E.2d at ___, 2024 WL 1571403 at *7 (quoting Syl. Pt. 4, in part, *Frank's Shoe Store v. W. Va. Human Rights Comm'n*, 179 W. Va. 53, 365 S.E.2d 251 (1986)). As indicated above, the circuit court concluded that petitioner failed to adduce evidence to satisfy the second element: that the Board was aware of petitioners' alleged whistleblower activity prior to his discharge. The logical necessity of this element has been explained by the United States Court of Appeals for the Fourth Circuit in the context of Title VII retaliation claims:

> "[T]he employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity. Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish . . . [a] *prima facie* case."

*Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

Like the circuit court, we find this factor dispositive. Petitioner provides no evidence whatsoever that any actual or purported[9] decisionmaker(s) involved in his termination—Mr. George, Mr. Hough, Mrs. Pennington, or more importantly, the Board members who voted for his termination—were aware of petitioner's alleged whistleblowing prior to his discharge.[10] In response to the circuit court's determination that the decisionmakers lacked knowledge, petitioner cites only to his own testimony recounting the bumper incident and his report to Mr. Crist—who

---

[9] Mr. George testified, however, that neither Mr. Hough or Mrs. Pennington were involved in the decision to recommend or terminate petitioner.

[10] In fact, neither the briefing nor appendix record so much as identify the voting Board members.

6

is not alleged to have been involved in the decision to terminate petitioner.[11] Petitioner further insists that the Board's denial that the decisionmakers had knowledge of his whistleblowing is merely a contested issue of fact requiring a jury's credibility determination. However, he offers no evidence whatsoever—even in his own testimony—suggesting that his alleged act of whistleblowing was made known to any purported decisionmaker prior to his termination. Without evidence from which a reasonable jury could find that a purported decisionmaker was aware of his allegations about Mr. Pennington or report to Mr. Crist, the Board cannot be found to have acted in retaliation for whistleblowing. Therefore, petitioner cannot establish a prima facie case of retaliation and the circuit court did not err in granting summary judgment as to his *Harless* claim.

### 2. "Hostile Environment" Claim under the HRA

Next, petitioner asserts that the circuit court erred in granting summary judgment as to his "hostile work environment" claim under the HRA, which he argues should have survived "under the same analysis" as his *Harless* claim. However, the circuit court granted summary judgment as to this claim on the basis that petitioner failed to allege that he was a member of a protected class identified in the HRA.[12] In response, petitioner does not assign this conclusion as error; rather, he

---

[11] In this regard, petitioner conflates the statutory definitional elements in the Whistleblower Law with the entirely separate requirement of causation for purposes of proving retaliation. Petitioner seemingly argues that he proved the Board's requisite knowledge of his whistleblowing because he made a report to Mr. Pennington's direct supervisor, Mr. Crist—who falls within the Whistleblower Law's definition of "employer." *See* W. Va. Code § 6C-1-2(c) ("Employer" means a person supervising one or more employees, including the employee in question, a superior of that supervisor, or an agent of a public body.").

As indicated above, we decline to delve into the significance of the statutory elements attendant to the substantial public policy upon which a *Harless* claim is premised for purposes of our resolution herein. *See supra* n.8. However, we observe that whether a plaintiff advances a common law retaliatory discharge claim premised on the Whistleblower Law or a statutory cause of action thereunder, both require proof of a causal connection between the whistleblowing and the retaliation. *See id.* § 6C-1-3(a) (making whistleblower retaliation actionable where committed "*because* the employee . . . makes a good faith report[] . . . to the employer or appropriate authority, an instance of wrongdoing or waste." (emphasis added)). As discussed *supra*, to establish a causal link between the whistleblowing and retaliation, an employee must necessarily make a prima facie showing of the decisionmaker's knowledge of the whistleblowing, rather than any imputed knowledge. *See Roberts*, 998 F.3d at 124 (stating that prima facie evidence of retaliation must be "centered on what the relevant decisionmaker knew at the time of the adverse employment action, not on any knowledge other employees may have had that could be imputed to the employer.").

[12] West Virginia Code § 16B-17-9(5) (formerly cited as West Virginia Code § 5-11-9(5)) prohibits discrimination against "any individual because of his or her race, religion, color, national origin, ancestry, sex, age, blindness or disability[.]"

appears to argue that he may assert a general "hostile work environment" claim regardless of whether he falls under the protection of the HRA.

This Court long ago debunked the idea that the HRA is available to redress general workplace inequities that are not rooted in the protected classes or activities delineated in the HRA: "We wish to clarify that, to be covered under the Human Rights Act, prohibited actions must be perpetrated against a member of one of the specific protected classes identified therein." *Michael v. Appalachian Heating, LLC*, 226 W. Va. 394, 402 n.16, 701 S.E.2d 116, 124 n.16 (2010). Similarly, the United States Supreme Court has cautioned that the federal equivalent to our HRA is not a "general civility code for the American workplace" and applies only to protected classes or activity. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U. S. 75, 80 (1998).

With regard to the circuit court's conclusion that petitioner may not sustain a cause of action under the HRA, we again find no error. Petitioner does not allege that he is a member of a protected class under the HRA such as to assert "harassment" or a "hostile environment" on that basis. Nor does petitioner allege that he engaged in activity protected under the HRA. The only "protected activity" petitioner asserts is "whistleblowing," i.e. making a report of perceived wrongdoing or waste—which is not activity protected by the HRA. *See State ex rel. Devono v. Wilmoth*, 248 W. Va. 654, 664 n.9, 889 S.E.2d 736, 746 n.9 (2023) ("[A] whistle-blower does not fall within the protected classes under the Human Rights Act. Thus, while Mrs. Arbogast may assert a cause of action under the Whistle-blower Law, she has no claim under the Human Rights Act for any retaliation she suffered as a result of reporting any wrongdoing by the pre-K teacher.").[13] Therefore, because petitioner does not assert that he is a member of a protected class or engaged in activities protected under the HRA, we find that the circuit court correctly granted summary judgment on this claim.

---

[13] Moreover, petitioner misconstrues cases in which this Court has permitted a *Harless* claim to proceed alongside or in lieu of a statutory HRA claim as standing for the proposition that an HRA-based claim is available to employees who do not fall within the statute's protected classes or activities. *See Roth*, 226 W. Va. at 214, 700 S.E.2d at 183 (permitting both statutory and HRA-based *Harless* claim); *Williamson*, 200 W. Va. at 421, 490 S.E.2d at 23 (permitting HRA-based *Harless* claim where employer did not fall within HRA but discharge was alleged to contravene HRA). In these cases, the employees indisputably alleged that they were members of a protected class statutorily delineated in the HRA and therefore fell within the protection extended by both the statute and/or the substantial public policy it expresses.

3. Malicious Prosecution

Finally, the circuit court granted summary judgment to the Board as to petitioner's malicious prosecution claim, finding that 1) he failed to demonstrate that the Board "procured" the prosecution; 2) a magistrate and grand jury found probable cause; and 3) his pre-trial diversion agreement was not an outcome "favorable" to petitioner. We note that petitioner focuses exclusively on the "procurement" element in his briefing and does not address the latter two elements. To prove malicious prosecution, the plaintiff must show:

> "(1) that the prosecution was set on foot and conducted to its termination, resulting in plaintiff's discharge; (2) that it was caused or procured by defendant; (3) that it was without probable cause; and (4) that it was malicious. If plaintiff fails to prove any of these, he can not recover."

Syl. Pt. 3, in part, *Truman v. Fid. & Cas. Co. of New York*, 146 W. Va. 707, 123 S.E.2d 59 (1961) (citations omitted). The Court later clarified the "discharge" factor by restating that the prosecution must have "'terminated favorably to plaintiff.'" Syl. Pt. 1, in part, *Preiser v. MacQueen*, 177 W. Va. 273, 352 S.E.2d 22 (1985) (citations omitted); *see also* Syl. Pts. 1, 2, and 3, *Norfolk S. Ry. Co. v. Higginbotham*, 228 W. Va. 522, 721 S.E.2d 541 (2011) (restating elements and clarifying that they are the same).

We find that the "favorable termination" or "discharge" element is dispositive here. Petitioner makes no response whatsoever in his briefing to the circuit court's determination that his agreement to enter into a pre-trial diversion did not constitute a "favorable" outcome as required for malicious prosecution. The circuit court referenced a line of federal cases, all of which hold that pre-trial diversion agreements "are not synonymous" with a *nolle prosequi* or acquittal. *See, e.g. Patterson v. Yeager*, No. 2:12-CV-01964, 2015 WL 3644007, at *10 (S.D.W. Va. Apr. 24, 2015) ("[C]ourts that have addressed the issue have overwhelmingly held that entering a pre-trial diversion agreement, as the plaintiff did, does not terminate a criminal action in favor of the defendant for purposes of bringing a malicious prosecution claim[.]"); *see also Gilles v. Davis*, 427 F.3d 197, 211 (3d Cir. 2005) (finding that pretrial diversion "constitutes an 'unfavorable' period of judicially imposed limitations on freedom" that are "not consistent with innocence" for purposes of tort liability based upon prosecution). We agree.

Nor does the element upon which petitioner focuses break in his favor. His primary argument that the Board "procured" his prosecution is that the prosecuting attorney is designated the Board's "statutory attorney." However, the prosecuting attorney serves as counsel to the Board as to civil, not criminal, matters.[14] Alternatively, he argues that Mr. George's alleged assent to prosecution was sufficient to have "procured" the prosecution. However, that argument would render *any* criminal complainant one who has "procured" a prosecution—a position this Court has

---

[14] "The prosecuting attorney shall also attend to civil suits in the county in which the state or any department, commission, or board thereof, is interested, and to advise, attend to, bring, prosecute, or defend, as the case may be, all matters, actions, suits, and proceedings in which such county or any county board of education is interested." W. Va. Code § 7-4-1(a).

rejected. *See Higginbotham*, 228 W. Va. at 528, 721 S.E.2d at 547 ("[I]t is apparent that procurement within the meaning of a malicious prosecution suit requires more than just the submission of a case to a prosecutor; it requires that a defendant assert control over the pursuit of the prosecution.").[15]  We therefore find no error in the circuit court's award of summary judgment as to petitioner's malicious prosecution claim.

## IV. Conclusion

For the foregoing reasons, we affirm the June 24, 2022, order of the Circuit Court of Fayette County, West Virginia.

Affirmed.

**ISSUED**: October 25, 2024

**CONCURRED IN BY**:

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn

---

[15] Petitioner makes a vague allusion to the "false evidence" exception to the procurement element but does not identify what "false" evidence the Board allegedly provided.